**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Landmark Insurance Company, Plaintiffs/Counter–Defendants,**

v.

**David F. BROWN, Robert F. Ehrling, Tore T. Debella, Richard Reizen, Reuben O'D. Askew, Defendants/Counter-Plaintiffs.**

**No. 91–1510–CIV.**

United States District Court, S.D. Florida.

Oct. 4, 1991.

**ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT**

EDWARD B. DAVIS, District Judge.

THIS MATTER is before the court on the motion for partial summary judgment on counts I and II of the counterclaim filed by David F. Brown, Robert F. Ehrling,

Tore T. DeBella, Richard Reizen, and Reuben O'D. Askew (collectively "the Insureds").[1] The Insureds, in substance, request the Court to require National Union to continue funding the defense of certain civil and criminal actions on a current basis under the terms of a directors and officers liability policy.

## I. FACTUAL BACKGROUND

The Insureds are all former directors and officers of General Development Corporation ("GDC").[2] Beginning in 1985, GDC purchased primary and excess insurance policies from National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union").[3] GDC subsequently purchased primary and excess renewal policies in the same amounts from National Union covering periods from 1986 through 1988, and from 1989 to 1990.[4] For the policy period September 13, 1988 to September 13, 1989, GDC purchased renewal primary and excess policies from Landmark Insurance Company ("Landmark").[5]

As early as September 1988, GDC notified National Union that a number of civil suits had been filed by GDC customers against GDC and certain of its officers and directors alleging that GDC had committed fraud in connection with the marketing and sale of its lots and houses ("the housing complaints"). On March 2, 1990, GDC notified National Union that GDC was a target of a federal grand jury investigation, and on March 20, 1990, an indictment was filed in this district against GDC, Mr. Brown and Mr. Ehrling, charging them with fraud. On March 22, 1990, GDC agreed to plead guilty to one count of conspiracy. Shortly thereafter, a number of securities class actions were filed in this district and the Southern District of New York accusing the Insureds and other GDC directors and officers of securities fraud for, *inter alia,* allegedly failing to disclose the substance of the allegations recited in the indictment ("the class actions").

On April 6, 1990, GDC filed a petition for reorganization under Chapter 11 of the United States Bankruptcy Code. The Insureds allege, and National Union does not dispute, that the bankruptcy filing prevented GDC from funding the Insureds' defense of any pending litigation. Thereafter, the Insureds and other GDC directors and officers requested that National Union pay defense costs as incurred in the pending civil actions. So, beginning in August 1990, National Union entered into a series of interim-funding agreements with counsel for the directors and officers named in the civil lawsuits, in which it agreed to pay legal fees and defense costs as incurred.[6] In December 1990, GDC's guilty plea was accepted. Also that month, a superseding indictment was filed against Mr. Brown, Mr. Ehrling, Mr. DeBella, and Mr. Reizen ("the criminal action").[7]

In response, the Insureds in the criminal action sought funding from National Union for defense costs as incurred, and were

1. All of the "Insureds" are named insureds under the insurance policies at issue herein.

2. Mr. Brown was Chairman of the Board of Directors of GDC from 1985 to 1990. Mr. Ehrling was President of GDC from 1980 to 1990, and was a member of the Board of Directors of GDC at all relevant times. Mr. DeBella was the Senior Vice–President of Marketing for GDC at all relevant times. Mr. Reizen was Vice–President of Marketing for GDC from 1982 to 1989. Mr. Askew was a director of GDC from 1985 to 1990. *See* Paragraphs 62–66 of the Counterclaim.

3. The primary policy provided coverage from September 13, 1985 to September 13, 1986 with a $10 million limitation of liability. The excess policy provided coverage in the amount of $5 million on claims in excess of $25 million.

4. Each National Union policy contained two sections entitled: (1) Directors and Officers Liability, and (2) Corporation Reimbursement.

5. National Union and Landmark are owned by American International Group Inc. *See* Paragraph 69 of Counterclaim.

6. Indeed, the interim-funding agreements provided that National Union would use its best efforts to remit payment for defense costs within twenty (20) days from the billing date.

7. The superseding indictment charged four of the Insureds with violating Title 18, United States Code, Sections 2, 371, 1341, & 2314. One of the Insureds, Mr. Askew, was not indicted or otherwise charged with any criminal wrongdoing.

prepared to litigate National Union's duty to pay defense costs as incurred. As a result, beginning in late January 1991, National Union entered into a series of similar interim-funding agreements to pay legal fees and defense costs for the four Insureds in the criminal action as those fees and costs were incurred. Relying on this funding, counsel for the Insureds, with the knowledge of National Union, began to prepare a complex and expensive defense. The criminal action is set for trial in this district on October 22, 1991, and is expected to last at least four months.

The instant dispute arose on July 15, 1991 when National Union and Landmark filed a complaint alleging application fraud as the basis for rescinding all of the GDC director and officer ("D & O") policies. Simultaneously, National Union mailed written notice to civil and criminal counsel terminating the interim-funding agreements pursuant to the forty-five (45) day notice provision provided in the agreements. On August 30, 1991, National Union stopped funding the defense of the criminal action and the civil actions.

In response, the Insureds filed a counterclaim seeking a declaration that National Union is obligated to pay the Insureds' defense costs as incurred. The funding for the defense of the criminal action is of particular interest at this time because the trial is scheduled to commence in less than three weeks. Consequently, the Insureds filed a motion for partial summary judgment on an expedited basis on its counterclaim, and agreed with National Union that for purposes of the summary judgment motion, the court should consider only the 1987 D & O Policy.

## II. SUMMARY JUDGMENT STANDARD

A party seeking summary judgment bears the burden of demonstrating that there exists no genuine dispute as to any material fact, and that it is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c) and (e); *Anderson v. Liberty Lobby,*

*Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). All reasonable doubts as to the facts are to be resolved in favor of the party opposing summary judgment. *Mercantile Bank & Trust Co. v. Fidelity & Deposit Co.,* 750 F.2d 838, 841 (11th Cir.1985). While the burden on a party seeking summary judgment is great, the opposing party has a duty to present affirmative evidence in order to defeat a properly supported motion for summary judgment. *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

Because the duty of National Union to pay defense costs rests upon the legal effect of the provisions of an insurance contract, the interpretation of the contract is a matter of law for the court to determine, and is therefore appropriate for summary judgment. *Gulf Tampa Drydock Co. v. Great Atlantic Ins. Co.,* 757 F.2d 1172, 1174 (11th Cir.1985); *Payne v. United States Fidelity & Guar. Co.,* 625 F.Supp. 1189, 1191 (S.D.Fla.1985); *Smith v. State Farm Mut. Auto. Ins. Co.,* 231 So.2d 193, 194 (Fla.1970).

## III. DISCUSSION

### A. INTRODUCTION

The Insureds argue that they are entitled to partial summary judgment on several grounds. First, the Insureds argue that National Union is required to contemporaneously fund the defense of the criminal and civil actions. Second, the Insureds argue that National Union is equitably estopped from bringing its rescission action at this time. Third, the Insureds argue that National Union's rescission complaint is barred by the Florida Claims Administration Statute.

The equitable estoppel and the Florida Claims Administration arguments relate to National Union's pending rescission action. Because dismissing the rescission action will not resolve the present controversy over interim funding of defense costs, the court will defer ruling on those arguments.[8] Therefore, the narrow issue be-

---

**8.** Initially, the court is confronted with the fact that National Union's complaint for rescission

seeks to void the 1987 D & O Policy from its inception. Of course, if the 1987 D & O Policy

fore the court today is whether the 1987 D & O Policy requires National Union to contemporaneously fund the Insureds' defense of the criminal action and the various civil actions. To decide this issue, the court looks first to the terms of the 1987 D & O Policy.

## B. THE 1987 D & O POLICY

■ To interpret the 1987 D & O Policy, the court will rely on the basic principles of Florida law governing the interpretation of insurance policies.[9] It is well-settled in Florida that (1) the language used in an insurance policy is interpreted based on its popular and usual significance, unless the context requires a different conclusion; and (2) that provisions which tend to limit or avoid liability are construed in favor of the insured and strictly construed against the insurer. *Rouse v. Greyhound Rent–A–Car, Inc.,* 506 F.2d 410, 415 (5th Cir.1975) (citations omitted) (applying Florida law).

■ The 1987 D & O Policy first sets forth the scope of coverage in Clause 1, the insuring clause. The insuring clause provides in pertinent part that:

> [National Union] will pay for each and every past, present or future Director or Officer of [GDC], Loss arising from any claim(s) first made against them during the policy period by reason of any Wrongful Act in their capacity as a Director or Officer of [GDC].

The parameters of that coverage are further delineated by the various definitions provided in Clause 2. From the scope of coverage provided by Clauses 1 and 2, the 1987 D & O Policy lists several types of exclusions in Clause 4.

The definition of the term "loss" under the 1987 D & O Policy must be examined to determine the extent and timing of National Union's obligation to pay defense costs for the Insureds. The Insureds requested that National Union pay their fees and costs as incurred in the litigation pursuant to Clause 2(c) which requires National Union to pay:

> any amount which the Insureds *legally must pay* for a claim or claims for Wrongful Acts. Loss shall include damages, judgments, settlements, *costs, charges, and expenses ... incurred in the defense of actions,* suits or proceedings and appeals therefrom. (emphasis added).

Clause 6(a) of the 1987 D & O Policy provides that:

> Costs, charges and expenses of defense are part of Loss insured by this policy....

Next, the definition of "wrongful acts" under the 1987 D & O Policy must be examined to determine which type of claims are compensable under the "loss" provision. Wrongful acts are defined in Clause 2(d) as:

> any breach of duty; neglect; error; misstatement; misleading statement; omission; or other act done or wrongfully attempted by the Directors or Officers; or any of the foregoing so alleged by any claimant; or any matter claimed against them solely because they are Directors or Officers.

From the coverage provided by Clauses 1 and 2, the 1987 D & O Policy contains certain exclusions. The most relevant exclusion is contained in Clause 4:

> [National Union] shall not be liable to make any payment for Loss in connection with any claim or claims made against the Insureds:
>
> .  .  .  .  .
>
> (d) brought about or contributed to by the fraudulent, dishonest or criminal acts of the Insureds; however the provisions of this exclusion shall not apply unless a judgment or other final adjudication thereof adverse to the In-

---

were rescinded, National Union would have no obligation to pay defense costs at any time. However, the court cannot declare the 1987 D & O Policy void *ab initio* until the rescission action is fully litigated. In the meantime, the 1987 D & O Policy remains in effect.

9. The parties do not dispute that Florida substantive law applies in this diversity action. *See Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

sureds shall establish fraud, dishonesty or criminal acts.

The pending civil actions and the criminal action essentially allege that the directors and officers engaged in a scheme to defraud numerous home buyers and investors. The focus of the alleged wrongdoing in each action is inherently different, but the conduct addressed derives from the same alleged scheme. The court finds that the allegations in the criminal and civil actions fall within the definition of wrongful acts under the 1987 D & O Policy. Therefore, the court concludes that the Insureds' defense costs in the pending civil and criminal actions are covered by the 1987 D & O Policy.

█ The existence of the exclusion in Clause 4(d) does not contradict this result. Pursuant to the exclusion, National Union is not liable to make payment for losses arising out of claims made against the Insureds for fraud, dishonesty or criminal acts. The exclusion does not apply unless there is a final adjudication adverse to the Insureds that establishes fraud, dishonesty or criminal acts. The allegations in the civil and criminal actions appear to fall within the scope of the exclusion in Clause 4(d). However, the exclusion does not apply at this time because there has been no final adjudication establishing that the Insureds engaged in fraud, dishonesty or criminal acts.

█ Having determined that the defense costs for the civil and criminal actions are covered, the court must decide whether the 1987 D & O Policy requires National Union to pay defense costs when they are incurred by the Insureds, or whether it can forego payment of defense costs until the underlying lawsuits are adjudicated or settled.

The timing of National Union's obligation to pay defense costs is not explicitly addressed by the 1987 D & O Policy. However, a plain reading of the "loss" provision in the 1987 D & O Policy leads to the conclusion that National Union is obligated to pay the Insureds' defense costs as they are incurred, not at some future time when the underlying action giving rise to a claim is adjudicated or settled. Under the 1987 D & O Policy, loss is incurred when the directors or officers "legally must pay" claims arising from wrongful acts. As such National Union's duty to pay defense costs accrues when the Insureds are billed for defense costs. At that point, the Insureds' "loss" is determinable, and they legally must pay those costs.

The 1987 D & O Policy is perhaps best understood by considering the appropriate rubric. In analyzing insurance contracts, the timing of an insurer's duty to pay under an insurance policy is a feature that distinguishes a liability policy from an indemnity policy. As the Third Circuit stated in *Little v. MGIC Indem. Corp.*, 836 F.2d 789, 793 (3d Cir.1987):

> In general, under an *indemnity* policy the insurer is obligated only to reimburse the insured for [a] covered loss that the insured himself has already paid. Under a *liability* policy, by contrast, the insurer's obligation to pay arises as soon as the insured incurs liability for the loss; the insured need not pay the loss first. (emphasis added).[10]

Given those principles, the 1987 D & O Policy is a liability policy. The following factors support this conclusion. First, the title of the section of the 1987 D & O Policy at issue is "Directors and Officers Liability." Second, there is a sharp contrast between the definition of loss in the D & O Liability and Corporation Reimbursement sections of the 1987 Policy. In the Corporation Reimbursement section, loss is defined as "any amount the Company *shall have paid* to a Director or Officer as *indemnity* for a claim or claims against them by reason of any Wrongful Act in their capacity as such." Thus, the corporation may only make claims for amounts it has already paid. In contrast, the D & O Lia-

---

10. *See also Continental Oil Co. v. Bonanza Corp.,* 677 F.2d 455, 459 (5th Cir.1982) (describing a liability policy as one in which the insurer must pay the damages in contrast to an indemnity policy in which the insurer simply reimburses the insured for expenses the insured has already paid); 11 G. Couch, Cyclopedia of Insurance Law, 2d § 44:4, at 187–88 (M. Rhodes ed. 1984).

bility section of the 1987 Policy defines loss as "any amount which the Insureds legally must pay." The only reasonable interpretation of the loss clause in the 1987 D & O Policy is that the insurer's obligation to pay accrues when the insured incurs the obligation, not after it has paid a judgment. Finally, several courts have concluded that policies with provisions similar to the "loss" provision in the 1987 D & O Policy are properly characterized as liability policies, not indemnity policies.[11]

■ In contrast to the Insureds' position, National Union argues that the 1987 D & O Policy does not require the funding of defense costs as incurred. The most that can be said in favor of National Union's position is that the timing of payment for defense costs is ambiguous. Generally, an ambiguity exists when the language of a policy is susceptible to different reasonable interpretations, one resulting in coverage, and one resulting in exclusion. *Gulf Tampa Drydock*, 757 F.2d at 1174–75. Under Florida law, such ambiguities must be construed against the insurer and in favor of the insured. *Id.* at 1174; *Rigel v. National Casualty Ins.*, 76 So.2d 285, 286 (Fla. 1954). The court has determined that the Insureds' interpretation is reasonable. Even if National Union's interpretation were reasonable, the 1987 D & O Policy would be ambiguous, and under Florida law, that ambiguity would have to be construed against National Union.

■ National Union also argues that there is no duty to defend under the 1987 D & O Policy. That is correct. Without question, Clause 6(a) relieves National Union of any "duty to defend" the Insureds.[12] However, a duty to defend is distinguishable from the duty to pay the Insured's defense costs as they are incurred in litigation.[13] As the Ninth Circuit stated in *Gon*

*v. First State Insurance Co.*, 871 F.2d 863, 868 (9th Cir.1989), "[a] policy with a duty to defend typically contains a clause that provides that the insurer chooses the attorney and controls the strategy of the litigation." Noting that the policy in *Gon* contained no such clause, the court concluded that the absence of a duty to defend was not crucial to the decision that the policy required defense costs to be paid as incurred. *Id.*

. In this case, the "no duty to defend clause" means that National Union is not required to initiate the defense of litigation on behalf of the Insureds, or participate in the control or strategy of such litigation. However, the "no duty to defend clause" does *not* mean that National Union is relieved from its duty to pay the Insureds' defense costs as incurred.

## C. THE CASE LAW

■ The court in this diversity action must first determine if it is bound by any applicable authority in Florida in deciding when National Union's obligation to pay defense costs accrues. First, the court must apply the law of Florida as articulated by the Florida Supreme Court. *Samuels v. Doctor's Hospital, Inc.*, 588 F.2d 485, 488–89 (5th Cir.1979); *Allstate Ins. Co.*, 703 F.Supp. at 914. In the absence of any Florida Supreme Court precedent, a federal district court applying Florida law is bound by decisions of Florida's intermediate appellate courts. *Blanchard v. State Farm Mut. Auto. Ins. Co.*, 903 F.2d 1398, 1399 (11th Cir.1990). However, a federal district court applying Florida law may disagree with applicable Florida intermediate appellate court decisions if there is persuasive indication that Florida's Supreme Court would hold otherwise. *See Studstill v. Borg Warner Leasing*, 806 F.2d 1005,

---

11. *See, e.g., Gon v. First State Ins. Co.*, 871 F.2d 863, 868 (9th Cir.1989); *Little*, 836 F.2d at 793; *Okada v. MGIC Indem. Corp.*, 823 F.2d 276, 280 (9th Cir.1987); *FSLIC v. Burdette*, 718 F.Supp. 649, 661 (E.D.Tenn.1989); *Mt. Hawley Ins. Co. v. FSLIC*, 695 F.Supp. 469, 475 (C.D.Cal.1987). *But see Zaborac v. American Casualty Co.*, 663 F.Supp. 330, 332 (C.D.Ill.1987).

12. The 1987 D & O Policy at Clause 6(a) reads in pertinent part: "[National Union] do[es] not, under the terms of this policy, have any duty *to defend*...."

13. *See Allstate Ins. Co. v. Travers*, 703 F.Supp. 911, 913 (N.D.Fla.1988) (applying Florida law and stating that "[a]n insurance carrier's duty to defend is distinct and separate from its liability to pay under the policy").

1007 (11th Cir.1986); *Bradbury v. Wainwright,* 718 F.2d 1538, 1540 (11th Cir.1983).

### 1. *Florida Law*

The parties have been unable to locate any applicable Florida Supreme Court authority on the timing of an Insurer's obligation to fund the costs of defense under a D & O liability policy like the one at issue here. Instead, National Union argues that this court is bound by the Florida Second District Court of Appeal's decision in *National Union Fire Ins. Co. v. Goldman,* 548 So.2d 790 (Fla. 2d DCA 1989) (*"Goldman"*). The court disagrees.

In *Goldman,* Aerosonic Corporation and two of its directors were sued in California for violating RICO and various securities laws, and committing fraud. The suit alleged that the two directors acted *"other than as directors and officers of Aerosonic." Id.* at 791. Thereafter, Aerosonic and the two directors brought suit in the Pinellas County Circuit Court seeking a declaration that National Union was obligated to contemporaneously fund the defense of the California litigation on behalf of the three plaintiffs. In response, National Union asserted in its affirmative defenses that "no coverage existed because the directors were charged with securities violations and acts of dishonesty in their *individual capacities rather than as officers and directors of the corporation." Id.* (emphasis added).

The trial court granted summary judgment and ruled that the two directors were entitled to contemporaneous payment of their defense costs. In reviewing the trial court decision, the *Goldman* court held that "[b]ecause [it is] alleged that [the directors] acted with dishonest purpose and in their *individual capacities,* substantial questions of fact remain before it can be determined whether National Union will be obliged to pay anything under the policy." *Id.* at 792. The court concluded its discussion by stating that "[b]ecause the contract is silent as to the timing of the payment of defense costs, and because the extent, if any, of the loss cannot be determined without resolution of substantial factual issues, summary judgment was in error." *Id.* at 792–93.

Although, the D & O section of the policy in *Goldman* is similar to the 1987 D & O Policy, *Goldman* is inapplicable. First, the *Goldman* court's holding was premised on the fact that the directors were sued in their individual capacities. That fact is critical because under both the *Goldman* policy and the 1987 D & O Policy, acts committed by directors in their individual capacity are not covered whether or not those allegations are actually proven at trial. The Insureds in this action seek funding for the defense of actions against them in their capacity as former directors and officers of GDC. That makes *Goldman* inapplicable.

Second, the court in *Goldman* relied on the "company reimbursement" section of the policy in determining that the directors of Aerosonic were not entitled to contemporaneous funding of defense costs.[14] Here, the Insureds seek contemporaneous funding pursuant to the "directors and officers liability" section of the 1987 Policy, not the "corporation reimbursement" section. The *Goldman* court may simply have quoted from the wrong section of the policy. However, this court cannot base its ruling on speculation that the *Goldman* court meant to quote something other than what is in the opinion. For these reasons, *Goldman* is inapplicable, and this court will consider the judgment of courts outside of Florida to inform its decision.

### 2. *Decisions Outside of Florida*

Numerous federal courts have confronted the issue of contemporaneous payment of defense costs pursuant to a directors and officers liability policy. Most of those courts have required the insurer to pay

---

**14.** In its discussion of the contemporaneous duty to pay defense costs, the *Goldman* court quoted the definition of "loss" from the "company reimbursement" section of the policy. *See* Exh. A, Original Affidavit of Jeffrey R. Gaylord

(Copy of policy in *Goldman* entitled as a whole "Directors & Officers Liability and Corporation Reimbursement", although the individual sections of the policy are entitled "Company Reimbursement" and "Directors & Officer Liability").

defense costs when they are incurred by the insured. *See, e.g., Gon v. First State Ins. Co.*, 871 F.2d 863, 868 (9th Cir.1989); *Little v. MGIC Indem. Corp.*, 836 F.2d 789, 793–94 (3rd Cir.1987); *Okada v. MGIC Indem. Corp.*, 823 F.2d 276, 280–81 (9th Cir. 1987); *FSLIC v. Burdette*, 718 F.Supp. 649, 661 (E.D.Tenn.1989); *Mt. Hawley Ins. Co. v. FSLIC*, 695 F.Supp. 469, 475 (C.D.Cal. 1987); *American Casualty Co. v. Bank of Montana System*, 675 F.Supp. 538, 541–44 (D.Minn.1987); *PepsiCo, Inc. v. Continental Casualty Co.*, 640 F.Supp. 656, 659–60 (S.D.N.Y.1986). All of these cases construed D & O policies with "loss" clauses similar to the "loss" clause in the 1987 D & O Policy.

For example, in *Little*, the Third Circuit reviewed a D & O policy that defined "loss" as "any amount which the Directors and Officers are *legally obligated* to pay ... for a claim or claims made against the Directors and Officers for Wrongful Acts and shall include ... damages, judgments, settlements, costs ... and *defense of legal actions....*" *Id.* at 792. After analyzing this definition, the Third Circuit concluded that "the only reasonable interpretation is that [the duty to pay defense costs] arises at the time the insured becomes 'legally obligated to pay.' To infer any other ... later time for the insurer's duty to pay would be arbitrary because nothing in [the definition of loss] gives any guidance as to when this later time might be." *Id.* at 794. This court agrees with the reasoning of the Third Circuit in *Little* and the Ninth Circuit in *Okada* and *Gon.*

In response, National Union argues that this court should follow five federal cases which did not find a contemporaneous duty to pay directors' defense costs. The court finds these cases inapplicable and unpersuasive. First, *Zaborac v. American Casualty*, 663 F.Supp. 330 (C.D.Ill.1987), held that the policy it construed was an indemnity policy, and without explanation concluded that the insurer's duty to pay defense costs did not accrue until the underlying action was adjudicated or settled. The "insuring clause" in *Zaborac* stated that "the insurer agrees to pay: all Loss which the Directors and Officers ... shall become legally obligated to pay." *Id.* at 332. Loss is then defined as "any amount which the Directors and Officers ... are legally obligated to pay ... and shall include ... defense of legal actions...." *Id.* Because the court in *Zaborac* inexplicably ignored the plain language of the policy, the court finds it unpersuasive.

*Zaborac* is distinguishable because the policy at issue there contained an "option clause" which permitted the insurer to advance costs at its option.[15] The *Zaborac* court concluded that the option clause gave the insurer "the option, but not the obligation, to advance defense costs as they are incurred." *Id.* at 334. The 1987 D & O Policy contains no such option clause, and on that basis alone *Zaborac* is inapplicable.[16] Indeed, three of the other cases cited by National Union are inapplicable because of the existence of an option clause similar to that found in *Zaborac. See Luther v. Fidelity and Deposit Company of Maryland*, 679 F.Supp. 1092, 1093 (S.D.Fla. 1986) (Kehoe, J.) (finding no duty to pay defense costs as incurred because the policy contained an "option clause" similar to that found in *Zaborac* ); *Enzweiler v. Fidelity & Deposit Co.*, Civ.A. No. 85–99,

---

**15.** The option clause in *Zaborac* reads in pertinent part: "[t]he insurer may at *its option* and upon request, advance on behalf of the Directors and Officers ... expenses which they have incurred in connection with claims made against them prior to disposition of such claims...." *Id.* at 334.

**16.** It is quite clear that for many courts, the existence of such an option clause is dispositive. For example, compare Judge Brieant's decision in *PepsiCo, Inc. v. Continental Casualty Co.*, 640 F.Supp. 656, 659–60 (S.D.N.Y.1986) with his decision in *Board of Educ. of Yonkers v. CNA Ins.*

Co., 647 F.Supp. 1495, 1507 (S.D.N.Y.1986) (finding *PepsiCo* distinguishable because it did not contain an "option clause").

*Zaborac* is also distinguishable because the policy there contained a "no action clause" which explicitly proscribed legal action against the insurer until the insured's obligation was determined by trial or settlement. *Id.* at 333. The 1987 D & O Policy's "no action clause" does not, on its face, prevent the Insureds from suing the Insurer before a judgment is entered against the Insureds. Therefore, *Zaborac* is also inapplicable on that ground.

1986 WL 20444 (E.D.Ky. May 13, 1986) (same); *Clandening v. MGIC Indem. Corp.*, Civ. No. 83–2432–LTL, (C.D.Cal. May 23, 1983) (LEXIS, Genfed library, Dist file) (same).

Finally, National Union cites *Bank of Commerce & Trust Co. v. National Union Fire Ins. Co.*, 651 F.Supp. 474, 476–77 (N.D.Okla.1986), in which the court denied the insured's motion for summary judgment on the issue of whether the insurer was required to pay defense costs as incurred. There the court found summary judgment inappropriate because it was unclear to what extent the allegations against the insured officer were based on his actions as an owner of another defendant company *not* covered by the policy. Clearly that is not at issue with the Insureds in this case, and therefore, *Bank of Commerce* is also inapplicable. Thus, National Union has no applicable, well-reasoned opinions to support its interpretation of the 1987 D & O Policy.[17] Therefore, its interpretation of the 1987 D & O Policy must fail.

## D. POLICY CONSIDERATIONS

The court's decision is based primarily on its interpretation of the 1987 D & O Policy and consideration of the case law. Nevertheless, certain policy considerations underlying the circumstances of this case cannot be ignored.

National Union's argument that it is not liable to pay defense costs until the underlying litigation is resolved is problematic for two reasons. First, permitting National Union to "wait on the sidelines" is unreasonably harsh on the Insureds. As the district court in *Little v. MGIC Indem. Corp.* stated:

> If [a] D & O policy [allowed] the insurer to withhold payment whenever charges of intentional dishonesty are leveled against directors and officers, as [the insurer claims], then insurers would be able to withhold payment in virtually every case. That would be a most unsatisfactory result. It would leave directors and officers in an extremely vulnerable position. Any allegations of intentional dishonesty, no matter how groundless, could bring financial ruin upon a director or officer....

> Directors and officers would be forced to advance all their defense expenditures, which are likely to be staggering. Meanwhile, the insurer defers all payment until the final disposition of [the] suit, which may take years. This situation is unreasonably favorable to the insurers, who may blithely disclaim responsibility for the insured's enormous financial burdens while the insured must fight on. *Little v. MGIC Indem. Corp.*, 649 F.Supp. 1460, 1468–69 (W.D.Pa.1986).

The district court in *Little* was discussing the unconscionability of allowing the insurer to invoke an option clause to defer payment for defense costs. While the issue of the unconscionability of an option clause is not before this court, the reasoning of the district court in *Little* demonstrates the unfairness of National Union's position in this case.[18]

---

**17.** National Union also cited three reported state court cases in support of their position; none are applicable. *See Continental Casualty Co. v. Board of Educ.*, 302 Md. 516, 489 A.2d 536, 539, 543 (1985) (distinguishable because the school's board of education policy contained an option clause); *Amrep Corp. v. American Home Assurance Co.*, 81 A.D.2d 325, 440 N.Y.S.2d 244, 246 (1981) (inapplicable because the plaintiff was the company seeking reimbursement under corporation reimbursement section of its policy); *Gribaldo, Jacobs, Jones & Assoc. v. Agrippina Versicherunges, A.G.*, 3 Cal.3d 434, 91 Cal. Rptr. 6, 476 P.2d 406 (1970) (inapplicable because policy at issue was an architect's professional indemnity policy, not a D & O liability policy).

**18.** The court is not insensitive to National Union's position that it may have difficulty recouping payments for defense costs if the Insureds are convicted and the fraud exclusion applies. However, as the Third Circuit in *Little* found, "[a]t most, this argument demonstrates that [the insurer] has sound business reasons for wishing not to be bound to pay an insured's defense costs before resolution of the underlying claim. The argument does not prove that [the insurer] succeeded in drafting a policy that unambiguously states this intention." *Little*, 836 F.2d at 796. The same reasoning applies here.

Second, when National Union's stake in this decision and the effect on the Insureds is considered, the unfairness of National Union's position on this issue is manifest. National Union cannot be allowed to pull the plug on the Insureds' defense funding seven weeks before trial. If National Union were allowed to stop funding the defense of the criminal action on the eve of trial, it is likely to disrupt the Insureds' trial preparation, and perhaps increase the chances for a conviction against the Insureds. Under Clause 4(d) of the 1987 D & O Policy, National Union is not liable to make any payment for claims brought about by the fraudulent, dishonest or criminal acts of the Insureds. However, National Union cannot invoke the exclusion unless there has been a final adjudication establishing fraud, dishonesty or criminal acts. Thus, National Union stands to gain if the Insureds are convicted because it then will be able to deny coverage for any claims in the pending civil actions. National Union cannot be allowed to influence the probability of the policy exclusions applying. Such a result is unacceptable.

## IV. CONCLUSION

In summary, a plain reading of the insuring clause and the definition of "loss" clause leads to the conclusion that defense costs in the 1987 D & O Policy are payable at the time the directors and officers incur them, not at some future time. Even if the timing of such payment were ambiguous, the ambiguity would be construed against National Union and in favor of the Insureds. Finally, this court is not bound by the *Goldman* decision, and the weight of applicable authority outside of Florida supports the court's conclusion.

Therefore, upon due consideration, it is hereby

ORDERED AND ADJUDGED that the Insureds' Motion for Partial Summary Judgment is GRANTED. National Union shall pay the Insureds' defense costs as they are incurred until fraud, dishonesty or

criminal acts are established by a judgment or other final adjudication thereof adverse to the Insureds.[19]

DONE AND ORDERED.

---

**19.** Because the interim-funding agreements negotiated by the parties provided a reasonable mechanism for paying the Insureds' legal fees and costs before this dispute arose, this method should continue to be followed to avoid subsequent problems.