# In re WORLDCOM, INC. SECURITIES LITIGATION

**This Document Relates to: 03 Civ.652, 03 Civ.4640, 04 Civ.4567, 03 Civ.758, 04 Civ.4089, 03 Civ.7927, 04 Civ.4546.**

**Master File No. 02 Civ. 3288(DLC).**

United States District Court,
S.D. New York.

Feb. 3, 2005.

---

**458**

George E. Ridge, Pro Hac Vice, Cooper Ridge & Lantinberg, P.A., Jacksonville, FL, Cory E. Friedman, New York, NY, for Plaintiff Bert C. Roberts, Jr.

Wallace A. Christensen, Ross, Dixon & Bell, LLP, Washington, D.C., Daniel A. Cohen, Kornstein Veisz Wexler & Pollard, LLP, New York, NY, for Defendant Continental Casualty Company.

Wayne E. Borgeest, Ann Marie Collins, Kaufman Borgeest & Ryan LLP, Valhalla, NY, for Defendant Twin City Fire Insurance Company.

Richard A. Kissel, Charles Hyman, Kissel & Pesce LLP, Tarrytown, NY, for Defendant SR International Business Insurance Co.

Jennifer A. Klear, Alan Joaquin, Drinker Biddle & Reath LLP, New York, NY, for Defendant Gulf Insurance Company.

Geoffrey S. Harper, Beth G. Jaynes, Autumn J.S. Huang, Fish & Richardson P.C., New York, NY, for Amicus Curiae of Francesco Galesi.

## OPINION & ORDER

COTE, District Judge.

This motion addresses the right of a member of a board of directors to receive from his insurer payment of the costs of defending himself against litigation when the insurer contends that the insurance policy has been rescinded due to a submission of allegedly false financial statements with an application for insurance. Bert C. Roberts, Jr. ("Roberts"), a former chairman of the board of directors of WorldCom, Inc. ("WorldCom") seeks an order compelling Continental Casualty Company ("Continental") to honor an excess directors and officers ("D & O") liability policy that it issued and to advance immediately the costs of defending Roberts against claims filed in a host of lawsuits arising from the collapse of WorldCom which allege principally violations of federal securities laws. Continental asserts that it rescinded the D & O policy for fraud, that it is void *ab initio*, and that as a result, it has no present obligation to pay defense costs. For the reasons stated below, Roberts' motion is granted.

*Background*

On June 25, 2002, WorldCom announced a massive restatement of its financial statements. The first class action lawsuit to anticipate that announcement had been filed in this district on April 25, 2002. Many more followed. The litigation concerning WorldCom filed in federal court, or successfully removed to federal court, has been consolidated for pretrial purposes in the Southern District of New York by the Judicial Panel on Multi–District Litigation and assigned to this Court. Roberts is named as a defendant in the consolidated WorldCom securities class action as well as in numerous other related lawsuits. The issues in and the history of the consolidated WorldCom securities litigation (*"Securities Litigation"*) have been described in many previous Opinions.[1]

---

1. *See, e.g., In re Worldcom, Inc. Sec. Litig.,* 2005 WL 89395 (denying Arthur Andersen's partial motion for summary judgment and granting in part and denying in part Lead Plaintiff's motion for summary judgment); *In re Worldcom, Inc. Sec. Litig.,* 346 F.Supp.2d 628 (S.D.N.Y.2004) (granting in part and denying in part underwriters' and Lead Plaintiff's cross motions for summary judgment); *In re WorldCom, Inc. Sec. Litig.,* 294

WorldCom and its officers and directors were insured under a D & O liability policy issued by National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union"). The National Union policy provided primary coverage.

The first page of the National Union renewal policy for 2002 states in bold letters "NOTICE: ... THE INSURER MUST ADVANCE DEFENSE COSTS PAYMENTS PURSUANT TO THE TERMS HEREIN PRIOR TO THE FINAL DISPOSITION OF A CLAIM." The National Union policy provision that defines the coverage for directors is contained in Clause 1, entitled "Insuring Agreements. Coverage A: Directors and Officers Insurance," and provides as follows:

> This policy shall pay the Loss of each and every Director or Officer arising from a Claim first made against the Directors or Officers during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act in their respective capacities as Directors or Officers of the Company, except when and to the extent that Company has indemnified the Directors or Officers. *The Insurer shall, in accordance with and subject to Clause 8, advance Defense Costs of such Claim prior to its final disposition.*

(Emphasis supplied.) Clause 8 of the policy provides:

> Under both Coverage A and Coverage B of this policy, except as hereinafter stated, the Insurer *shall advance,* at the written request of the Insured, *Defense Costs prior to the final disposition of a*

*Claim. Such advanced payments by the Insurer shall be repaid to the Insurer by the Insureds or the Company severally according to their respective interests, in the event and to the extent that the Insureds or the Company shall not be entitled under the terms and conditions of this policy to payment of such Loss.*

(Emphasis supplied.)

The National Union policy provides for limited severability for individual directors in connection with three questions. National Union did not require the questions to be answered since they were included as part of a renewal program, and they were not answered. Of particular interest here, one question stated "9. (a) No Executive has *knowledge or information* of any act, error or omission that might give rise to a Claim ... under the proposed policy, except as follows:...." (Emphasis supplied.) The National Union policy continued with the statement that

> [i]t is agreed that with respect to Questions 8, 9 and 10 above, that *if such* claim, proceeding, action, *knowledge, information or involvement exists,* then such Claim, proceeding or action and any Claim or action arising from *such* claim, proceeding, action, *knowledge, information or involvement is excluded* from the proposed coverage.

(Emphasis supplied.)

Endorsement No. 1 of the policy provides that "[i]f this policy has been in effect for thirty (30) days or more, the Insurer may cancel this policy only if one or more of the following reasons apply: ... 2) ... a material or willful misstatement or omission of fact ... in connection

F.Supp.2d 392 (S.D.N.Y.2003) (deciding motions to dismiss the consolidated class action complaint); *In re WorldCom, Inc. Sec. Litig.,* 219 F.R.D. 267 (S.D.N.Y.2003) (certifying the consolidated class action); *In re WorldCom,*

*Inc. Sec. Litig.,* 294 F.Supp.2d 431 (S.D.N.Y. 2003) (deciding a motion to dismiss claims in an individual action which had been consolidated for pre-trial purposes with the *Securities Litigation* ).

with any application [ ], or claim...." Such a cancellation occurs thirty days after notification of cancellation.

On July 21, 2002, WorldCom filed for bankruptcy protection. On November 8, 2002, WorldCom filed an Emergency Motion Pursuant to Bankruptcy Rule 9019(a) for Approval of Debtors' Settlement Agreement with National Union. As part of the terms of this agreement, the National Union D & O policy was rescinded and voided *ab initio* as to WorldCom only. The agreement provides the following as to directors:

The Policies provide rights and coverage to the directors, officers, and employees of WorldCom as insureds under the Policies severally, and not jointly or with imputation of knowledge or conduct, with respect to the applications for the Policies and the exclusions in the Policies, and *the Policies are not rescinded as to any directors*, officers, and employees of WorldCom as insureds under the Policies.

(Emphasis supplied.)

On November 26, 2002, the bankruptcy court approved this settlement agreement. National Union acknowledged the coverage obligations of its policy as to the WorldCom directors and officers and its coverage has been paid in full and is exhausted.

This suit concerns the rights of the insureds vis a vis the excess carriers. After being contacted by the New York office of an insurance agent acting on behalf of WorldCom, in December 2001, Continental sold an excess directors, officers, and corporate liability insurance policy to WorldCom. Altogether, WorldCom and its officers and directors were insured for D & O liability coverage under seven tiers of excess D & O policies issued by Continental; Twin City Fire Insurance Company ("Twin City"); Associated Electric & Gas Insurance Service Limited ("AEGIS"); Gulf Insurance Company ("Gulf"); SR International Business Insurance Company ("Swiss Re"); Starr Excess Liability Insurance International Limited ("Starr"); and in a final tier, National Union (collectively, the "Excess Insurers"). With one apparent exception that is not relevant to the instant motion,[2] all of the excess D & O policies follow the form, including the terms, conditions, and exclusions, of the underlying National Union D & O policy.

As part of the application for the Continental policy, WorldCom submitted WorldCom's 10–K for the year ending December 21, 2000; WorldCom's 10–Qs for the second and third quarter of 2001; WorldCom's annual report for 2000; and various registration statements filed with the Securities and Exchange Commission. Together, the seven tiers of excess insurance provided $85 million in coverage in addition to $15 million in coverage provided under National Union's primary policy for a total of $100 million in insurance coverage.[3]

The first lawsuit arising from the WorldCom debacle was apparently filed on March 26, 2002, in Mississippi. WorldCom, *on behalf of Roberts*, timely notified the National Union and the Excess Insurers of the litigation, and complied with all conditions precedent in the excess D & O policies, or is otherwise excused from doing so. WorldCom demanded that the Excess Insurers acknowledge that the D & O policies are required to pay the defense

---

**2.** At a default judgment hearing on July 19, 2004, Starr asserted that its excess policy differed from the underlying National Union D & O policy in that it contains a provision mandating arbitration in Bermuda.

**3.** The premium for the $15 million Continental policy was just under $2 million.

costs incurred in connection with what is now known as the *Securities. Litigation.*

In a September 12, 2002 letter to World-Com,[4] Continental indicated that based on the material misrepresentations and omissions by WorldCom and its officers and directors, it considered its excess D & O policy to be void·*ab initio* and viewed the policy as rescinded. In the September 12 letter, Continental stated that it would "next week return the premium payment of $1,300,000 together with interest required by law."[5]

On January 28, 2003, Continental filed a declaratory judgment action in the Southern District of New York seeking a judicial determination that it had properly rescinded its policy.[6] An August 1, 2003 order ("August 1 Order") of the Bankruptcy Court stayed that action, captioned *Continental Cas. Co. v. Ebbers*, No. 03 Civ 652(DLC). The August 1 Order concluded that the action, as well as a parallel action brought by Twin City, No. 03 Civ. 758(DLC), were void *ab initio* as they should not have been brought without first seeking relief from the automatic stay.[7] Meanwhile, on January 29, 2003, WorldCom filed an adversary proceeding in the Bankruptcy Court on behalf of itself and its directors seeking a declaration of rights under the excess D & O policies. Continental opposed WorldCom's motion for partial summary judgment in the adversary proceeding by arguing that its policy

was void *ab initio* and rescinded. On April 20, 2004, WorldCom emerged from bankruptcy. A May 14, 2004 order of the Bankruptcy Court concluded that it was no longer the proper forum to address disputes about the WorldCom insurance policies and proceeds. Having confirmed a plan which resolved WorldCom's rights and duties under the insurance. policies, the court concluded that the resolution of the dispute between the Excess Insurers and non-debtor officers and directors "would have a de minimus" effect on the estate · and did not warrant its involvement.[8]

On May 28, 2004, Roberts filed the instant action, No. 04 Civ. 4089(DLC), seeking a declaration of the rights, duties, and responsibilities of the Excess Insurers. In particular, Roberts seeks a declaration that the purported rescission of the Continental policy and other D & O policies issued to WorldCom was without good or sufficient cause. On June 4, 2004, Roberts made a written demand for coverage of defense costs to Continental. None of the Excess Insurers has advanced defense costs to Roberts or the other director defendants in the *Securities Litigation.*

On June 30, Roberts submitted an order to show cause why an order should not be entered compelling Continental immediately to advance defense costs to Roberts for the *Securities Litigation.* At a conference

4. Roberts was not copied on the September 12 letter from Continental. Roberts asserts that the first notice he received from Continental indicating its intention to rescind its excess policy was on January 28, 2003, when Continental sought a declaratory judgment in the Southern District of New York.

5. Neither Roberts nor Continental have addressed whether the premium was returned.

6. On June 18, 2004, the action was transferred to this Court from the Honorable Alvin K. Hellerstein.

7. Continental and Twin City appealed the decision of the Bankruptcy Court. These appeals are Nos. 03 Civ. 7927(DLC) and 03 Civ. 9460(DLC), respectively.

8. At a conference on July 7, 2004, Continental and Twin City were asked to consider whether they wished to proceed with their January 2003 litigation in light of doubts that would always exist as to the legitimacy of those actions, and the existence of other litigation through which their claims can be resolved. They have not yet indicated what course they wish to pursue in this regard.

on July 7 a briefing schedule was set. Continental and Twin City have opposed the June 30 application; Gulf and Swiss Re have joined in that opposition. Former WorldCom director Francesco Galesi ("Galesi") has filed an *amicus curiae* brief in support of Roberts' application.

On July 19, oral argument on this application was held. The Court indicated that it would be granting Roberts' motion. The issuance of this Opinion has been delayed based on the representation of the Excess Insurers and counsel for all of the WorldCom director defendants except Roberts and Galesi that a settlement had been negotiated between them and the Lead Plaintiff in the WorldCom securities class action ("Settlement").

On January 6, 2005, the Settlement was formalized and presented to the Court. A revised Stipulation of Settlement was submitted to the Court on January 18. Various parties to the class action and others objected to the Settlement. An Order of February 2, 2005 advised the parties that the judgment reduction formula in the Settlement violated Subsection 21D(f) of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4(f)(7)(B)(i). That same day, the Lead Plaintiff gave notice that it was terminating the Stipulation of Settlement on the ground that it refused to risk "a substantial reduction in any judgment against the remaining Defendants."

Meanwhile, WorldCom had created a $25 million indemnification fund ("Indemnification Fund"), which was approved by the bankruptcy court in January 2004, as part of WorldCom's plan of bankruptcy, to pay the reasonable legal expenses of current and former directors, officers, and employees. More recently, WorldCom proposed a plan of allocation for the Indemnification Fund in consultation with Roberts. This plan of allocation was approved by the Honorable Jed B. Rakoff of this District on December 21, 2004. Under the plan, any person seeking reimbursement from the Indemnification Fund "must have made good· faith efforts to obtain reimbursement through any potentially available insurance coverage." Roberts stated recently that he was "optimistic" that his legal expenses would be fully reimbursed by the Indemnification Fund. With the failure of the Settlement, it is now highly improbable that the attorney's fees and litigation expenses incurred by Roberts will be paid through a limited fund that can now expect substantial claims to be made as well by all of the other WorldCom directors.

*Discussion*

Roberts seeks a preliminary injunction requiring Continental to advance the costs he has spent and continues to spend defending himself in the *Securities Litigation*. Roberts contends that under the terms of the National Union and Continental policies and under New York law,[9] he is entitled to these defense costs prior to the adjudication of whether the Excess Insurers have effectively rescinded or are able to rescind their policies as to him. For its part, Continental does not dispute that the claims against WorldCom and its directors fall within the policies' definition of covered claims. Nor does it contest that the insurance policies entitle Roberts to defense costs. Continental argues, however, that the policies were issued in reliance on WorldCom's false financial statements and were therefore properly rescinded and are

9. Both Roberts and Continental have relied upon New York law, and by doing so, have adopted it for the determination of these issues. *See Photopaint Technologies, LLC v. Smartlens, Corp.*, 335 F.3d 152, 160 n. 8 (2d Cir.2003). In addition, among other contacts with New York, a New York broker obtained the Continental policy coverage for WorldCom.

void *ab initio.* It contends that New York law demands Roberts to show that he can defeat Continental's rescission defense before it can be required to provide him with defense costs.

■ A party seeking a preliminary injunction under Rule 65, Fed.R.Civ.P., is ordinarily required to demonstrate that absent injunctive relief, it will suffer irreparable harm, and that either (a) it is likely to succeed on the merits, or (b) there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in its favor. *Sunward Electronics, Inc. v. McDonald,* 362 F.3d 17, 24 (2d Cir.2004). To obtain an injunction which alters, rather than maintains, the status quo, a movant must establish a clear or substantial likelihood of success on the merits, as well as irreparable injury. *See No Spray Coalition, Inc. v. City of New York,* 252 F.3d 148, 150 (2d Cir.2001).

■ Where a preliminary injunction grants only part of the relief to which a movant would be entitled on the merits and requires a party "to do what it should have done earlier," then it is judged under the standard for prohibiting injunctions, and not the heightened standard for mandatory injunctions. *Johnson v. Kay,* 860 F.2d 529, 541 (2d Cir.1988). *See also Brewer v. W. Irondequoit Central Sch. Dist.,* 212 F.3d 738, 744 (2d Cir.2000) (heightened standard appropriate where injunction will "provide the movant with substantially all the relief sought"); *Alcatel Space, S.A. v. Loral Space & Communications Ltd.,* 154 F.Supp.2d 570, 580

(S.D.N.Y.2001). The heightened standard should only apply "if a preliminary injunction would make it difficult or impossible to render a meaningful remedy to a defendant who prevails on the merits at trial." *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 35 (2d Cir.1995).

■ The heightened standard for a preliminary injunction does not apply to Roberts' motion. He seeks only part of the benefits to which he is entitled under the policy, the policy language strongly supports his argument that Continental should already have been advancing defense costs, and the injunction will not substantially interfere with Continental's right to obtain a meaningful remedy if it prevails on the merits. If it succeeds on the merits, Continental will have no obligation to pay any judgments against Roberts, and, as the policy itself recognizes, it has the right to recoup the defense costs. Nevertheless, even if the heightened standard applies, Roberts has established a clear and substantial likelihood of showing that he is entitled to defense costs prior to the adjudication of the rescission issues, and irreparable injury if those costs are not paid as they are incurred.[10]

### A. Success on the Merits

■■ The starting point for any analysis of the merits must be the text of the insurance agreement. A court must determine if the parties contemplated and resolved the issue. Their contract is the best evidence of their intentions. *Seabury Const. Corp. v. Jeffrey Chain Corp.,* 289

---

**10.** While Roberts has shown that the balance of hardships tips decidedly in his favor and that there are sufficiently serious questions on the merits of the rescission issues to satisfy the ordinary standard for a preliminary injunction, and has shown a substantial likelihood of success on his claim that he is entitled to defense costs in advance of the resolution of the rescission issues, he has not shown yet a substantial likelihood of success on the rescission issues. If the mandatory injunction standard applies here, and he is required to show a substantial likelihood of success on the rescission issues, then this injunction may not issue.

F.3d 63, 68 (2d Cir.2002). Under New York law, "an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract. The initial interpretation of a contract is a matter of law for the court to decide." *Bowman v. Allstate Ins. Co.*, 238 F.3d 468, 470 (2d Cir.2001) (citation omitted). To the extent an ambiguity exists and is unresolved by extrinsic evidence, such ambiguity is read against the insurer. *See, e.g., Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83, 88 n. 7 (2d Cir.2002); *Morgan Stanley Group Inc. v. New England Ins. Co.*, 225 F.3d 270, 276 (2d Cir.2000); *McCostis v. Home Ins. Co. of Indiana*, 31 F.3d 110, 113 (2d Cir.1994) (addressing dispute regarding the duty to defend). "The rule that insurance policies are to be construed in favor of the insured is most rigorously applied in construing the meaning of exclusions incorporated into a policy of insurance or provisions seeking to narrow the insurer's liability." *Ingersoll Mill. Mach. Co. v. M/V Bodena*, 829 F.2d 293, 306 (2d Cir.1987). *See also* L. William Caraccio, *Void Ab Initio: Application Fraud As Grounds For Avoiding Directors' And Officers' Liability Insurance Coverage*, 74 Cal. L.Rev. 929, 930 (May 1986) (courts should "take a jaundiced view of insurers' use of [preexisting knowledge clauses] to avoid coverage").

■ Under New York law, where a contract of insurance includes the duty to defend or to pay for the defense of its insured, that duty is a "heavy" one.[11] *McGinniss v. Employers Reinsurance Corp.*, 648 F.Supp. 1263, 1271 (S.D.N.Y. 1986) (citing *Int'l Paper Co. v. Continental Cas. Co.*, 35 N.Y.2d 322, 326, 361 N.Y.S.2d 873, 320 N.E.2d 619 (1974)). This duty is independent of the ultimate success of the suit against the insured. *Id.* (citing *Spoor–Lasher Co. v. Aetna Cas. and Sur. Co.*, 39 N.Y.2d 875, 876, 386 N.Y.S.2d 221, 352 N.E.2d 139 (1976)). The duty of an insurer to pay an insured's defense costs "is distinct from and broader than its duty to indemnify." *Federal Ins. Co. v. Tyco Int'l Ltd.*, Index No. 6005007/03, 2004 WL 583829, at *6 (N.Y.Sup. Mar.5, 2004); *see also Little v. MGIC Indem. Corp.*, 836 F.2d 789, 793 (3d Cir.1987). The duty to pay defense costs "exists whenever a complaint against the insured alleges claims that may be covered under the insurer's policy." *Tyco*, 2004 WL 583829, at *6; *see Wedtech Corp. v. Federal Ins. Co.*, 740 F.Supp. 214, 221 (S.D.N.Y.1990); *PepsiCo, Inc. v. Continental Cas. Co.*, 640 F.Supp. 656, 660 (S.D.N.Y.1986). In sum, the duty to pay defense costs is "construed liberally and any doubts about coverage are resolved in the insured's favor." *Tyco*, 2004 WL 583829, at *6.

■ It is a general principle under insurance law, that the obligation to pay under a liability policy arises as soon as the insured incurs the liability for the loss, in contrast to an indemnity policy where the obligation is to reimburse the insured for a loss that the insured has already satisfied. *See McCuen v. American Cas. Co. Of Reading Pennsylvania*, 946 F.2d 1401, 1406–07 (8th Cir.1991); *Little*, 836 F.2d at 793; *Nat'l Union Fire Ins. Co. of Pitt. v. Brown*, 787 F.Supp. 1424, 1429 (S.D.Fla.1991), *aff'd*, 963 F.2d 385 (11th Cir.1992); 11 G. Couch, *Cyclopedia of Insurance Law 2d* § 44:4, at 187–88 (M. Rhodes ed.1984). Thus, under a D & O policy with a duty to pay defense costs provision, "the insurance company's obligation to reimburse the directors attaches as soon as the attorneys' fees are in-

11. In contrast to a duty to pay defense costs, the duty to defend customarily includes an insurer's right to choose the attorney and to control the litigation strategy. Am Jur. Ins. § 1396. *See Continental Oil Co. v. Bonanza Corp.*, 677 F.2d 455, 459 (5th Cir.1982).

curred." *Wedtech Corp.*, 740 F.Supp. 214 at 221 (collecting cases); *see PepsiCo*, 640 F.Supp. at 659; *see also McCuen*, 946 F.2d at 1407 (applying Iowa law); *Okada v. MGIC Indem. Corp.*, 823 F.2d 276, 282 (9th Cir.1986) (applying Hawaii law); *Little*, 836 F.2d at 794 (applying Pennsylvania law); *FDIC v. Booth*, 824 F.Supp. 76, 81 (M.D.La.1993) (applying Louisiana law). As the Honorable Harold Baer has observed, "to hold otherwise would not provide insureds with protection from financial harm that insurance policies are presumed to give." *Nu–Way Environmental, Inc. v. Planet Ins. Co.*, No. 95 Civ. 573(HB), 1997 WL 462010, at *3 (S.D.N.Y. Aug.12, 1997) (construing policy that was silent as to timing of payment of defense costs).

 Under New York law, "[a]n insurer may avoid an insurance contract if the insured made a false statement of fact as an inducement to making the contract and the misrepresentation was material." *Curanovic v. New York Cent. Mut. Fire Ins. Co.*, 307 A.D.2d 435, 762 N.Y.S.2d 148, 150 (3d Dep't 2003); N.Y. Ins. Law §§ 3105(a), (b). If an insurer can show that it was induced to accept an application that it might otherwise have refused it is entitled to rescind the policy. *See Republic Ins. Co. v. Masters, Mates & Pilots Pension Plan*, 77 F.3d 48, 52 (2d Cir.1996); *Mutual Benefit Life Ins. Co. v. JMR Elecs. Corp.*, 848 F.2d 30, 32 (2d Cir.1988). Even an innocent misrepresentation, if material, will support rescission. *Vella v. Equitable Life Assur. Soc. of U.S.*, 887 F.2d 388, 391 (2d Cir.1989); *McLaughlin v. Nationwide Mut. Fire Ins. Co.*, 777 N.Y.S.2d 773, 774 (3d Dep't 2004). The burden of establishing the existence of a material misrepresentation is on the insurer. *First Financial Ins. Co. v. Allstate Interior Demolition Corp.*, 193 F.3d 109, 119 (2d Cir. 1999).

New York courts have consistently held that to meet the burden of proof on materiality, an insurer must submit evidence of its underwriting practices with respect to similar applicants. A court may not rely merely on statements by representatives of the insurer that it would not have issued the policy but for the representation.

*Id.* (citation omitted). In addition, to effect rescission, the insurer must repudiate the contract and return the insurance premium. *See Assoc. Electric & Gas Ins. Serv. Ltd. v. Rigas*, No. Civ.A.02–7444, 2004 WL 540451, at *5 (E.D.Pa. Mar.17, 2004); Allan D. Windt, *Insurance Claims & Disputes*, § 2:26 at 138 (West 2001) (hereinafter *"Windt"*). An untimely delay in a denial of coverage may bar the denial. *First Fin. Ins. Co. v. Jetco Contr. Corp.*, 1 N.Y.3d 64, 68–70, 769 N.Y.S.2d 459, 801 N.E.2d 835 (2003); *see also Chicago Insurance Co. v. Kreitzer & Vogelman*, No. 97 Civ. 8619, 2000 WL 16949, at *9 (S.D.N.Y. Jan. 10, 2000) (right to rescind must be promptly exercised). A severability clause or similar provisions in an insurance policy may entitle directors to coverage even when a policy is properly rescinded against the corporation. *See Wedtech Corp.*, 740 F.Supp. at 218.

 Until the issue of rescission is adjudicated, a contract of insurance remains in effect and the duty to pay defense costs is enforceable. In *Wedtech*, the Honorable Leonard Sand required an insurer to reimburse attorneys' fees as they were incurred by directors pending litigation of its right to rescind the policy as to each director. *Wedtech*, 740 F.Supp. at 221 (applying New York law). Relying on the policy's severability clause, the court found that the policy was not necessarily void *ab initio* with respect to each director. *Id.* at 218–19. Even more recently, the Honorable Helen Freedman held in insurance

litigation arising from the criminal and civil lawsuits pending against Tyco officers that under New York law the duty to pay defense costs is unaffected by an unproven claim for rescission. *Tyco*, 2004 WL 583829, at *5. After surveying the law of several jurisdictions she found that where an insured has challenged the right of an insurer to rescind its policies and has sought an adjudication that the policies are binding, courts have enforced the obligation of the insurers to perform under the policies and to defend or to pay defense costs. *Id.* at *6. *See also PepsiCo*, 640 F.Supp. at 659, 664 (finding ongoing duty to pay defense costs where insurance company had asserted a right to terminate the policy at will).

The law of other jurisdictions is consistent with these principles. In *Rigas*, 2004 WL 540451, the court in the Adelphia litigation granted a partial summary judgment motion for payment of defense costs despite the claim of the insurance company that the policy was properly rescinded, reasoning "because a contract is in effect until the issue of rescission is adjudicated, an insurer is bound by the obligations in that contract to advance defense costs until the contract is found to be rescinded." *Id.* at *5. The *Rigas* court was unable to reach the issue of rescission because of a bankruptcy stay. *Id.* at *4. In *Brown*, 787 F.Supp. 1424, the court granted the defendants' expedited partial summary judgment motion and found that there was a duty under Florida law to pay defense costs as they were incurred. *Id.* at 1430. It deferred ruling on the plaintiff-insurer's rescission claims. *Id.*

The National Union policy imposes the obligation upon National Union, and through its follow form policy upon Continental, to pay Roberts the costs of his defense as those costs are incurred. The National Union policy is a liability policy and contains explicit language requiring the insurer to advance costs of the defense and to do so prior to the final disposition of a claim brought against the insured.[12]

■■■ Continental contends that it is under no continuing obligation to pay defense costs since it gave notice to WorldCom that it regarded its policy as void *ab initio* and rescinded, and advised WorldCom that it "would" return the premium. It contends that Roberts has not shown a sufficient likelihood of success in defeating Continental's rescission argument.

Roberts is not, at this stage of the litigation, required to show that he will succeed in defeating Continental's rescission argument.[13] What Roberts must show is that,

---

**12.** The National Union policy language is an explicit repudiation of prior law that held that director and officer liability policies do not require reimbursement of legal expenses until the legal liability of the insured had been established. *See In re Ambassador Group*, 738 F.Supp. 57, 61 (S.D.N.Y.1990) (describing principle and its supporting precedent).

**13.** Roberts proffers that through discovery he will attempt to defeat the rescission argument by showing that under Continental's underwriting policies and standards, it accepts risks similar to that it contends it now perceives WorldCom's application to have posed. Roberts also argues that while it is conceded that the 2001 WorldCom financial statement was false, there is no such concession for the 2001 quarterly financial statement provided to Continental, and strong arguments to the contrary for the 1999 and 2000 financial statements. He contends that by accepting the policy without an answer to Question 9, National Union waived any representation by a director that the financial statements were accurate. Finally, he contends that Endorsement No. 1 to the National Union policy bars rescission and allows cancellation only for the period beginning thirty days after notice of cancellation. The *Securities Litigation* class action had been filed long before that date. It is now undisputed in the WorldCom class action that WorldCom's financial statement for the first quarter of 2001 contained materially false statements. *In re Worldcom, Inc. Sec. Litig.*, 346 F.Supp.2d at 660–61.

under the terms of the policies, he is entitled to payment of defense costs as they are incurred, and that as a matter of law, that obligation exists until the rescission issues have been litigated and resolved. He has carried that burden. Continental's effort to avoid payment of defense costs before the legality of the rescission has been litigated must fail. Continental's preemptive filing of a declaratory judgment action in this district was held to be in violation of the bankruptcy stay. The adversary proceeding in the bankruptcy court addressed to the rescission issues was never resolved. Despite this Court's offer, repeated on July 7 and 19, 2004, to resolve the rescission issue on an expedited basis, the Excess Insurers have never requested that discovery in Roberts' action begin. It bears noting that the agreement between National Union and WorldCom explicitly declared that the policies at issue there were not rescinded as to any director.[14]

*Anglo–American Insurance Co. v. Molin,* 547 Pa. 504, 691 A.2d 929 (1997), does not require a different result. The Supreme Court of Pennsylvania reversed an injunction requiring an insurance company to pay defense costs because the insured had not shown that its right to relief was clear. *Id.* at 514, 691 A.2d 929. Specifically, it had not shown that it was entitled to insurance coverage in the face of a policy exclusion. *Id.* The *Molin* court did not describe the policy language providing a right to defense costs or address the law regarding the duty to pay such costs as they are incurred. There is no basis from which to conclude, therefore, that the policy at issue in *Molin* is comparable to the one at issue here.

The other cases upon which Continental relies also do not require a different result. Continental has pointed to no cases that undermine the conclusion that National Union's policy requires payment of defense costs as they are incurred. Any cases interpreting New York law and arriving at a different conclusion are readily distinguishable based on their specific policy language. In *Stonewall Ins. Co. v. Asbestos Claims Management,* 73 F.3d 1178 (2d Cir.1995), the policies were indemnification policies that imposed a duty to reimburse defense costs only for those claims that were established to be covered through a judgment or a settlement. *Id.* at 1219. In *In re Kenai,* 136 B.R. 59 (S.D.N.Y.1992), the policy provided that the insurer would pay for a claim made against the insureds, including costs "incurred in the defense of actions." *Id.* at 64. The policy did not include the provision at issue here, which requires the insurer to "advance" defense costs "prior to" the disposition of a claim against the insured. In *In re Ambassador Group,* 738 F.Supp. 57, the policy established a priority system for payment out of limited insurance proceeds that "necessarily preclude[d] contemporaneous payment of legal fees." *Id.* at 63.

Continental, as does Twin City, relies heavily on *Chicago Ins. Co. v. Kreitzer & Vogelman,* No. 97 Civ. 8619(RWS), 2000 WL 16949 (S.D.N.Y. Jan.10, 2000), an opinion in which the Honorable Robert W.

---

**14.** Many of the cases that have required ongoing payment of defense costs pending resolution of rescission issues have done so by granting the insured's motion for partial summary judgement. In the unique circumstance of an ongoing duty to pay defense costs, there should be very little difference between the legal standard imposed on an insured to win a partial motion for summary judgment to obtain such payments, and the burden it carries to succeed on a preliminary injunction to achieve the same end. Neither requires the insured to address the defenses that may allow the insurer ultimately to succeed on its claim that coverage has been rescinded, and if the policy permits, to recoup any defense costs already advanced.

Sweet analyzed and denied an insurer's motion for summary judgment on whether it had properly rescinded its policy. In one sentence and without analysis, *Kreitzer* denied the insureds' cross-motion for a summary judgment on the insurer's duty to defend, to indemnify, and to reimburse defense costs. *Id.* at *10. It is impossible to determine the significance of this holding for the National Union policy since the *Kreitzer* opinion did not include the policy language at issue that may have triggered those obligations. It is interesting to note, however, that Judge Sweet also authored *McGinniss*, 648 F.Supp. 1263. As noted above, *McGinniss* stated that an insurer "has a heavy duty" to pay for the defense of its insured. *Id.* at 1271. *McGinniss* also asserted that "once the action against the insurer has been found to be within the coverage of the policy the insurer must pay the insured's defense costs as they are incurred." *Id.* There is no dispute that the securities actions against Roberts are within the coverage of Continental's policy.

Continental also relies on *Bogatin v. Fed. Ins. Co.*, No. 99–4441, 2000 WL 804433 (E.D.Pa. June 21, 2000). *Bogatin* is inapposite. In *Bogatin*, following a trial on rescission issues, the court determined that an insurance contract was rescinded before addressing the purported duty to advance defense costs to the insureds. *Id.* at *25. *Bogatin* did not state that a rescission issue must be determined first; nor did it find that the insureds would not have been entitled to contemporaneous payment of defense costs had they petitioned for it prior to trial. *Bogatin* stated simply that after determining that a contract was rescinded, it is not appropriate to award defense costs. *Id.* at *30–31.

Finally, Continental relies on a treatise on insurance. According to Continental, *Windt* states that when an insurer gives notice of rescission, it is not obligated to "provid[e][a] defense [for the insured] while the rescission action is pending." (Alterations as given by Continental.) The passage from *Windt* cited by Continental describes two options when an insurer believes a policy was procured by a misrepresentation. The insurer can either unilaterally rescind the policy and risk being sued for breach and additional liability for breaching its duty to settle; or file suit. It explains the adverse consequences of that latter strategy as follows:

> The disadvantage of filing a lawsuit and not rescinding absent a favorable judicial determination are: (1) that *if the insurer has a duty to defend, it will have to incur the cost of providing that defense while the rescission action is pending,* which expense will not be reimbursable even if the policy is later rescinded; (2) that even if the policy has only a cost reimbursement provision, the insured may be able to demand non-reimbursable interim payments to fund his or her defense while the rescission action is pending; . . . .

*Windt*, § 2:26 at 153 (emphasis supplied). This passage does not opine that insurers can escape the duty to pay defense costs as they are incurred prior to a determination of rescission issues when a D & O liability policy specifically provides for the advancement of defense costs. Indeed, if anything, the passage recognizes that a court may require the payment of defense costs as rescission issues are litigated. Later, in the context of discussing the indemnification of defense costs, *Windt* states that where a claim is encompassed by the policy, "[c]ourts can be expected to interpret the policy in a manner favorable to the insured and hold that interim payments [to reimburse defense costs] at reasonable intervals are required." *Windt*, § 6:20 at 718–19.

## B. *Irreparable Harm*

██ "The showing of irreparable harm is perhaps the single most important prerequisite for the issuance of a preliminary injunction." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir.2002) (citation omitted). To establish irreparable harm, a party must show that "there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation". *Id.* Irreparable harm must be shown to be "actual and imminent, not remote or speculative." *Id.* (citation omitted). Proof of a monetary loss will not suffice. The movant must show "evidence of damage that cannot be rectified by financial compensation." *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir.1989). Irreparable harm is found where, "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir.1999).

██ The failure to receive defense costs when they are incurred constitutes "an immediate and direct injury." *Wedtech*, 740 F.Supp. at 221. To hold otherwise, "would not provide insureds with protection from financial harm that insurance policies are presumed to give." *Nu–Way*, 1997 WL 462010, at *3.[15]

Roberts has shown irreparable injury. The *Securities Litigation* is proceeding apace. The class action trial begins on February 28, 2005. Every party, including each director defendant, requires effective representation. It is impossible to predict or quantify the impact on a litigant of a failure to have adequate representation at this critical stage of litigation. The ability to mount a successful defense requires competent and diligent representation. The impact of an adverse judgment will have ramifications beyond the money that will necessarily be involved. There is the damage to reputation, the stress of litigation, and the risk of financial ruin—each of which is an intangible but very real burden.

D & O insurance is not only designed to provide financial security for the individual insureds, but also plays an important role in corporate governance in America. Unless directors can rely on the protections given by D & O policies, good and competent men and women will be reluctant to serve on corporate boards. As the Third Circuit has observed, a primary purpose of Delaware indemnification provisions is "to encourage capable men to serve as corporate directors, secure in the knowledge that expenses incurred by them in upholding their honesty and integrity as directors will be borne by the corporation they serve." *Witco Corp. v. Beekhuis*, 38 F.3d 682, 691 (3d Cir.1994) (citation omitted); *see McLean v. Int'l Harvester Co.*, 817 F.2d 1214, 1222 (5th Cir.1987).

Continental and Twin City argue that Roberts has failed show irreparable injury because he has not shown that he is unable to retain counsel from his own funds.[16]

---

**15.** Irreparable injury has also been found to exist where an insurer sought to force an insured whose policy covers defense costs to substitute his attorney of a decade with other counsel. *Emons Indus., Inc. v. Liberty Mutual Ins. Co.*, 749 F.Supp. 1289, 1293 (S.D.N.Y. 1990) (citing *Gerard v. Almouli*, 746 F.2d 936,

939 (2d Cir.1984), and *Board of Education v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir.1979)).

**16.** At least one other attorney for a World-Com director has represented that his client has instructed him to stop participating in depositions and in certain other work because of the cost of legal fees.

**470**

The issues here surmount whether an individual director has or does not have sufficient funds to pay counsel when confronted with litigation stemming from service as a corporate director. In some cases the litigation will be minor; here it is massive. In some cases a director will have great personal wealth; in other cases she will not. The issue here is whether every director protected by a policy equivalent to National Union's is entitled to ongoing payment of defense costs until there is a judicial determination that that right does not exist. Under the terms of the National Union policy, and for the reasons set forth here, the answer is yes.

Twin City contends that *Mongelli v. Chicago Ins. Co.*, No. 99 Civ. 8149(SJ), 2002 WL 32096578 (E.D.N.Y. Jan.15, 2002), and *Dover Steel Co., Inc. v. Hartford Accident & Indemnity Co.*, 806 F.Supp. 63 (E.D.Pa.1992), require a finding that Roberts has failed to show irreparable injury. They do not. *Dover Steel* did not address a D & O policy; it focused on the duty to defend and indemnify a corporation. *Mongelli* addressed the obligation to defend the insured when both parties were in agreement that the policy did not cover the claim against the insured. *Mongelli*, 2002 WL 32096578, at *2.

Continental argues that as a policy matter it should not be compelled to reimburse defense costs as they are incurred when it its refusal is based on a right to rescind. It explains that it will be forced to litigate every rescission case to its conclusion instead of giving due consideration to a reasonable settlement of the underlying case. It further argues that while there may be a duty to defend until a decision is reached on the rescission issue, it need not await a judgment determination when there is only a duty to pay defense costs. There is no reasoned basis in law for the distinction advanced by Continental between a duty to defend and to

pay defense costs, and absolutely no basis in the National Union policy language. As for its "policy" argument, the existence of leverage with its insureds or its insured's adversaries premised on a breach of its legal obligations to its insureds is leverage gained improperly, and provides no basis for a ruling in its favor on this motion.

*Security Bond*

▉ Rule 65(c), Fed.R.Civ.P., provides, in pertinent part, that

No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

Rule 65(c), Fed.R.Civ.P. This Rule "thus allows a preliminary injunction to become effective only upon the applicant's positing of an amount that the district court determines adequate." *Corning Inc. v. Picvue Electronics, Ltd.*, 365 F.3d 156, 158 (2d Cir.2002). It is in the discretion of the district court to decide that, under the circumstances, no security is required. *See Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir.1997).

▉ Continental has requested that, if Roberts is granted defense costs prior to an assessment of its rescission claim, he be compelled to post a security bond for such costs. This request must be denied. Paying Roberts' defense costs places no undue hardship on the Continental as its liability is capped. In addition, the excess policies require defense costs to be repaid if Roberts is ultimately not entitled to such payments. Finally, the posting of a bond would undermine the very protection the Excess Insurers offered to directors when they followed the National Union form.

*Conclusion*

The motion by Bert C. Roberts, Jr. in 04 Civ. 4089 for a preliminary injunction against Continental Casualty Company requiring it to pay his costs of defense as they are incurred pursuant to the D & O policy it issued to WorldCom is granted. SO ORDERED.