# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LEGION PARTNERS ASSET MANAGEMENT, LLC, a Delaware Limited Liability Company, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. N19C-08-305 AML CCLD |
| UNDERWRITERS AT LLOYDS LONDON, | ) ) ) ) | |
| Defendant. | ) | |

**Submitted: June 22, 2020**
**Decided: September 25, 2020**

## <u>MEMORANDUM OPINION</u>

**Upon Plaintiff's Motion for Partial Summary Judgment: GRANTED**

David J. Soldo, Esquire, Patricia A. Winston, Esquire, of MORRIS JAMES LLP, Wilmington, Delaware, Attorneys for Plaintiff Legion Partners Asset Management, LLC.

Carmella P. Keener, Esquire, of COOCH AND TAYLOR, P.A., Wilmington, Delaware, Kim W. West, Esquire, Alec H. Boyd, Esquire, of CLYDE & CO US LLP, San Francisco, California, Attorneys for Defendant Underwriters at Lloyd's, London.

**LEGROW, J.**

This insurance coverage dispute requires the Court to determine whether a directors' and officers' insurance policy covers costs incurred by the insured organization in defending claims brought by the insured's former employee. Upon receiving notice that the organization's former employee filed a lawsuit against the organization and its principals, the insurer agreed to pay defense costs the principals incurred in the lawsuit. On the same day as the filing of the former employee's lawsuit, the insured organization brought an arbitration action against the former employee.

After his suit was stayed in favor of the arbitration, the former employee filed a counterclaim against the organization in the arbitration action. In both his complaint and counterclaim, the former employee alleged that the principals had breached their fiduciary duties to investors and violated federal laws and regulations. The arbitrator ultimately rejected the former employee's claims and allegations.

Before the arbitration concluded, the insured organization notified the insurer that it was seeking coverage for the costs incurred in defending the counterclaim. This dispute arose after the insurer denied the organization coverage for the costs it incurred defending the counterclaim.

The issue before the Court is whether the allegations in the counterclaim, when read as a whole, assert a risk within the policy's coverage, thereby implicating the insurer's obligation to advance defense costs. As explained below, the

1

counterclaim alleges the organization and its principals engaged in wrongful acts within the scope of the coverage. Accordingly, the insurer must indemnify the organization for the defense costs it incurred relating to the counterclaim. The allocation issues that remain between the parties cannot be resolved on the present record.

**FACTUAL AND PROCEDURAL BACKGROUND**

The following facts are drawn from the complaint and the record the parties provided.

## A. The LASC Action and the Arbitration

On May 14, 2018, Justin P. Albert, a former employee of Legion Partners Asset Management, LLC ("Legion"), initiated an action in Los Angeles County California Superior Court, Case No. BC706306 (the "LASC Action") against Legion and its two principal officers, managers, and directors, Raymond T. White and Christopher S. Kiper.[1] On May 22, 2018, Albert filed an amended complaint (the "Amended Complaint"), in which he asserted the following four counts: (1) Breach of Fiduciary Duty against White and Kiper; (2) Violation of California's Whistleblower Statute against Legion; (3) Wrongful Termination in Violation of

---

[1] Declaration of Ryan Keech ("Keech Decl.") ¶ 3.

Public Policy against Legion; and (4) Declaratory Judgment against Legion, White, and Kiper.[2]

On the same day that Albert initiated the LASC Action, Legion filed a demand for arbitration (the "Arbitration Demand") with the American Arbitration Association.[3] The Arbitration Demand asserted that Albert was employed by Legion as an Equity Analyst from February 2014 to October 2017,[4] and that he violated the Employment Agreement and Confidentiality and Intellectual Property Agreement that governed his employment with Legion.[5] Both agreements contained arbitration clauses requiring arbitration of all disputes arising from Albert's employment.[6] Legion alleged Albert tortiously interfered with Legion's business partnerships and revealed confidential information to third parties.[7] Specifically, Legion alleged the following claims for relief against Albert: (1) Breach of Contract; (2) Intentional Interference with Contractual Relations; (3) Intentional Interference with Prospective Economic Advantage; and (4) Misappropriation of Trade Secrets.[8]

On June 11, 2018, Legion filed a Petition to Compel Arbitration and Stay the LASC Action on the basis that Albert's claims against Legion were subject to

---

[2] *See* Plf.'s Op. Br. in Supp. of its Mot. for Partial Summ. J. ("Plf.'s Mot."), Ex. 4.
[3] Plf.'s Mot., Ex. 2 at 1.
[4] *Id*. at 3.
[5] *Id*.
[6] *Id*.
[7] *Id*.
[8] Plf.'s Mot., Ex. 2 at 3–9.

3

binding arbitration.[9]  On July 27, 2018, the Superior Court of California issued a

Minute Order (the "Minute Order")[10] and a Final Order (the "Final Order")[11] staying

the LASC Action and compelling Albert and Legion to enter into binding arbitration

to resolve their claims against each other.  The Minute Order stated, in relevant part,

as follows:

> Each of Plaintiffs claims against Defendant Legion Partners Asset Management, LLC are ordered to binding arbitration pursuant to the Agreement to Arbitrate between them. Plaintiffs Claims against the individual Defendants shall remain in this action.  The entire action is stayed pending the outcome of the arbitration between [Albert] and [Legion].[12]
>
> The Final Order stated:
>
> 1. The claims asserted by plaintiff Justin Albert in his Complaint and First Amended Complaint on file in the above-captioned action are the subject of a valid and enforceable arbitration agreement between plaintiff and Legion (only as to Defendant Legion Partners Asset Management, LLC);
>
> 2. Plaintiff is required and shall arbitrate those claims in the pending AAA arbitration proceedings filed by Legion (the claims against Defendants White and Kiper are excluded); and
>
> 3. Pursuant to CAL. CIV. PROC. CODE § 1281.4, [the LASC Action] is stayed in its entirety until the above-ordered consolidated arbitration is had. A Status Conference Re: Arbitration is set for May 20, 2018, 9:00 am. Counsel for Defendants to give Notice.[13]

---

[9] Plf.'s Mot., Ex. 5 at 17–20.
[10] Plf.'s Mot., Ex. 7.
[11] Declaration of Kim W. West ("West Decl.") Ex. A.
[12] Plf.'s Mot., Ex. 7.
[13] West Decl., Ex. A.

4

## B. Albert's Counterclaim

Consistent with the Final Order, Albert subsequently filed a counterclaim (the "Counterclaim") against Legion in the arbitration proceeding (the "Arbitration").[14] The Counterclaim asserted the following two counts against Legion: (1) Violation of California's Whistleblower Statute; and (2) Wrongful Termination in Violation of Public Policy.[15] To establish the grounds for these two counts, the Counterclaim alleged at paragraphs 1, 2, and 6 as follows:

> 1. This is an action to that stems from multiple breaches of fiduciary duty and violations of federal laws and regulations by two self-dealing hedge fund managers who abused their roles as fiduciaries to clients, including Respondent as well as the public school teachers of the State of California.[16]
>
> 2. Respondent, who attempted to act to protect his, the teachers', and the managers' other clients' interests was instead subjected to retaliation when he attempted to blow the whistle on the principals' illegal and improper conduct.[17]
>
> 6. White and Kiper abused the powers they had as officers, including White's role as Chief Compliance Officer, of Legion Partners to improperly oust non-party Bradley Vizi from the management of the companies based on falsified accusations of wrongdoing and a fraudulent investigation by Legion Partners's outside counsel. And White and Kiper operated the companies for personal gain by disclosing confidential, material information belonging to Legion

---

[14] *See* Katz Decl., Ex. 8.
[15] *Id.*
[16] *Id.* ¶ 1.
[17] *Id.* ¶ 2.

Partners's investors to the detriment of those investors—including Respondent and CalSTRS.[18]

The Counterclaim further explained that a reporter published an article in *Activistmonitor* concerning Legion's Investment Committee and its positions, valuation, and strategy of its investment in BroadSoft, Inc. (the "BroadSoft Article").[19] The specific details about the transactions in the BroadSoft Article were closely held confidential information that previously had not been made public.[20] Paragraph 59 of the Counterclaim details Albert's response to his concerns regarding a possible leak of material, nonpublic information by Legion's Investment Committee:

> 59. Respondent became concerned about the likely [Legion] Investment Committee leak of material, non-public information regarding the critical BroadSoft investment when he first saw the Activistmonitor article on or about September 8, 2017. Respondent immediately took action in response to having seen that article. Believing that the leak could only have come from White and Kiper, Respondent approached the one remaining uninvolved member of [Legion's] leadership team, his supervisor Bradley Vizi. Respondent expressed to Mr. Vizi his concerns about this leak and requested assistance on how best to handle the situation considering the key [Legion] individuals Respondent believed were involved. Respondent believed the Activistmonitor article revealed violations of Legion's Code of Ethics, and potentially federal and/or state laws and regulations. Respondent's disclosure to Mr. Vizi occurred before he was aware of the fraudulent investigation that eventually led to the ouster of Mr. Vizi.[21]

---

[18] *Id.* ¶ 6.
[19] *Id.* ¶ 41.
[20] *Id.* ¶ 42.
[21] *Id.* ¶ 59.

Count I of Albert's Counterclaim for Violation of California's Whistleblower Statute against Legion Partners alleges, in pertinent part:

> 85. Respondent engaged in activity protected by California's whistleblower statute, in that he disclosed, was about to disclose, or [Legion] believed he had disclosed information related to conduct that violated state or federal laws or regulations and/or that Respondent believed violated state or federal laws or regulations. ….[22]

> 88. [Legion's] adverse employment actions were taken because of Respondent's engagement in protected activity.[23]

Count II for Wrongful Termination in Violation of Public Policy against Legion Partners alleges:

> 92. [Legion's] adverse employment actions disregarded the public policy of this State.[24]

> 93. [Legion's] conduct was authorized or ratified by an officer, director, or managing agent of [Legion].[25]

> 94. As a direct and proximate result of [Legion's] conduct, Respondent was harmed.[26]

## C. Legion's affirmative defenses to the Counterclaim

Legion argues in this action that its responses to certain allegations made in the Counterclaim also responded to allegations in the corresponding LASC Action. Legion contends that paragraphs 6, 8, 9, 10, 11, and 12 of its answering statement to

---

[22] *Id.* ¶ 85.
[23] *Id.* ¶ 88.
[24] *Id.* ¶ 92.
[25] *Id.* ¶ 93.
[26] *Id.* ¶ 94.

the Counterclaim were in response to Albert's claims that explicitly rested on proof that White and Kiper breached their fiduciary duties to clients:

> 6. Legion further alleges that if it failed to perform any contractual or other legal duties, which it expressly denies, said performance was excused by Albert's own breaches or misconduct in this matter.[27]

> 8. Legion further alleges that Albert's counterclaims are barred because Legion has complied with and has fully performed any and all obligations imposed upon it by law, contract or equity such that any obligation owed to Albert has been satisfied, released or otherwise discharged.[28]

> 9. Legion further alleges that Albert's counterclaims are barred because Albert has or had unclean hands with respect to the matters alleged in the counterclaims and, therefore, Albert is barred from recovering any relief referenced in the counterclaims or any purported claim for relief alleged therein.[29]

> 10. Legion further alleges that Albert is estopped, by his conduct, from asserting the counterclaims upon which he seeks relief.[30]

> 11. Legion further alleges that Albert's counterclaims are barred, in whole or in part, to the extent that the relief requested against Legion would result in unjust enrichment.[31]

> 12. Legion further alleges that Albert's counterclaims are barred, in whole or in part, because any loss or damages sustained by Albert, if

---

[27] Plf.'s Mot., Ex. 11 ¶ 6. Specifically, Legion alleges that its defense responded to the following Counterclaim and LASC Action paragraphs (in parentheses): ¶¶ 1(¶ 1), 2(¶ 2), 6(¶ 6), 8(¶ 8), 9(¶ 2), 10(¶ 10), 11(¶ 11), 32(¶ 37), 33(¶ 38), 41(¶ 46), 42(¶ 47), 43(¶ 48), 48(¶ 53), 51(¶ 56), 52(¶ 57), 53(¶ 58), 56(¶ 61), 57(¶ 62), 63(¶ 68), 64(¶ 69), 65(¶ 70), 66(¶ 71), 67(¶ 72), 68(¶ 73). Keech Decl. ¶¶ 11–12. Nearly all of Albert's allegations against Legion Partners in the Counterclaim, including but not limited to paragraphs 6, 9, and 43, explicitly rest on proof of White and Kiper's breach of fiduciary duties to their clients. Legion's Mot. for Summ. J. at 20.
[28] *Id.* at 21. Specifically, Legion alleges that it responded to the following Counterclaim and LASC Action paragraphs (in parentheses): ¶¶ 6 (¶ 6), 8 (¶ 8), 9 (¶ 9), 32 (¶ 37), 33 (¶ 38).
[29] Plf.'s Mot., Ex. 11 ¶ 9.
[30] *Id.* ¶ 10.
[31] *Id.* ¶ 11.

any, was proximately caused or contributed to by Albert's own wrongful conduct.[32]

## D. The D & O Policy

Legion contends its defense of the counterclaim implicated a directors' and officers' liability policy (the "Policy") issued by Underwriters at Lloyd's London ("Underwriters"). Section I.A of the Policy establishes the three different circumstances under which Underwriters has an obligation to pay losses incurred by Legion or one of its insured persons:

> (1)    The Insurer shall pay, on behalf of any **Insured Person**, **Loss** which is not indemnified by the **Insured Organization** arising from **Claims** against such **Insured Person** for a **Wrongful Act**.

> (2)    The Insurer shall pay, on behalf of the **Insured Organization** for **Loss** which the **Insured Organization** pays as indemnification to any **Insured Person** arising from a **Claim** for a **Wrongful Act**.

> (3)    The Insurer shall pay, on behalf of the **Insured Organization**, **Loss** arising from **Claims** against any **Insured Organization** for a **Wrongful Act** (Privately Owned Managers).[33]

Legion argues its defense of the Counterclaim fell within Sections I.A.2 or I.A.3.

Section II.2 of the Policy defines "Claim," in relevant part, to include a "written demand, notice of complaint, suit or counterclaim . . . made against an Insured" and "formal notice of any arbitration . . . against an Insured."[34] "Wrongful Act" means "any actual or alleged breach of duty, neglect, error, misstatement,

---

[32] *Id.* ¶ 12.
[33] Plf.'s Mot., Ex. 1 § I.A.
[34] *Id.* § II.2

9

misleading statement, omission or act committed (or omitted)" by the Insured Organization or an Insured Person "solely in their respective capacities as such . . . ." [35] It is undisputed that Legion is the Insured Organization and White and Kiper are Insured Persons.[36] To summarize, under the Policy, Legion, White, and Kiper are insured against Losses, including attorneys' fees and costs, incurred in defense of a Claim for a Wrongful Act. A Claim includes a counterclaim advanced in an arbitration.

The Policy is not a duty to defend policy, but instead creates a duty to advance "Defense Costs" with an express allocation provision.[37] The allocation provision specifies that Underwriters is not obligated to make payments associated with "any portion(s) of Claims not covered by [the] Policy."[38] The parties agreed to allocate covered and uncovered losses based on the parties' relative financial and legal exposures and to use "reasonable best efforts" to agree on an allocation."[39]

### E. The November 2, 2018 Letter

On June 21, 2018, Arthur J. Gallagher & Co. Insurance Brokers of California, Inc. ("AJG"), Legion's U.S. broker for the Policy, first filed notice for coverage

---

[35] *Id.* § II.37.
[36] *Id.* at 12; *id.* at §II.19(1).
[37] Plf.'s Mot., Ex. 1 § V.B; *Id.* § V.C ("The Insurer shall advance covered Defense Costs no later than sixty (60) days after receipt from the Named Insured of sufficient information confirming its obligation to advance such Defense Costs, including but not limited to invoices and fee statements describing attorney work performed.").
[38] Plf.'s Mot., Ex. 1 § VI.
[39] *Id.*

regarding Albert's Claim.[40]  At the time of the tender, the Claim consisted of Albert's Amended Complaint filed in the LASC Action.

On November 2, 2018, Clyde & Co, on behalf of Underwriters, transmitted Underwriters' coverage position in a letter to AJG (the "November 2, 2018 Letter").[41]  In that letter, Underwriters acknowledged a coverage obligation for White and Kiper for the LASC Action, subject to a reservation of rights.[42] Underwriters informed Legion there was no coverage for White and Kiper for the Counts asserted against Legion in the Arbitration because Albert did not assert a "Claim" against White or Kiper.[43]  Underwriters also advised there was no entity coverage for Legion with respect to the LASC Action or the Arbitration.[44]  That is, Underwriters took the position that, under the Policy, only the breach of fiduciary duty claim against the Individual Insureds in the LASC action was covered.  On December 21, 2018 and January 23, 2019, Underwriters repeated its refusal to defend Legion at all or to defend White and Kiper in the Arbitration.[45]

## F. The Arbitration Award

In the Final Award dated August 6, 2019 (the "Arbitration Award"), the arbitrator held that Albert had not proved his counts against Legion for Violation of

---

[40] West Decl., Ex. B.
[41] Plf.'s Mot., Ex. 9.
[42] *Id*. at 7.
[43] Plf.'s Mot., Ex. 9 at 5, 7–8.
[44] *Id*. at 6.
[45] Declaration of David Katz ("Katz Decl.") ¶ 12; *See* Plf.'s Mot., Ex. 10.

California's Whistleblower Statute and for Wrongful Termination in Violation of Public Policy.[46] The arbitrator held Albert failed to establish that Legion's response to his "whistleblowing" warranted Albert's resignation from Legion.[47] The arbitrator held that Albert could not prove that he suffered an "adverse employment action" because the evidence showed he had not been discharged constructively.[48]

The arbitrator noted that both sides devoted a significant portion of the hearing and their closing briefs to disputing whether the BroadSoft Article contained unlawfully leaked material, nonpublic information. The arbitrator, however, found the "dispositive inquiry" was "whether Albert *reasonably believed* the conduct he complained of was illegal and whether [Legion's] response to Albert's complaint created an intolerable working condition warranting his resignation."[49] Both Albert and Legion ultimately were unsuccessful in proving their respective claims against each other. On December 4, 2019, the Los Angeles Superior Court confirmed the Arbitration Award as a judgment after the parties stipulated to confirm the Arbitration Award and dismiss the LASC Action ("Stipulation and Final Judgment").[50]

---

[46] Plf.'s Mot., Ex. 3 at 22–25.
[47] *Id*. at 24–25.
[48] *Id*. at 25.
[49] *Id*. at 23 (emphasis added).
[50] West Decl., Ex. E.

## G. Procedural background

In response to the November 2, 2018 Letter, Legion initiated this action against Underwriters on September 5, 2019. On October 1, 2019, Legion filed its amended complaint. A year later, Legion moved for partial summary judgment, seeking an order declaring that Underwriters has a duty to pay defense costs incurred by Legion in the LASC Action and the Arbitration. After briefing and oral argument, the Court took this matter under advisement. This opinion resolves the pending motion.

In its motion, Legion seeks reimbursement of defense costs for expenses incurred in the LASC Action. Legion first argues Underwriters must reimburse the arbitration expenses as defense expenses because (1) the arbitration expenses were "conducted against liability" in the LASC Action; (2) the "parallel legal proceeding" doctrine under California law supports Underwriters' obligation to reimburse arbitration expenses where the Arbitration and LASC arise from a common core of operative facts; and (3) the stay granted in the LASC Action did not end Underwriters' reimbursement obligations.[51] Under its "parallel legal proceeding" theory, Legion argues the defenses raised in the Arbitration are responsive to the

---

[51] Legion argued in its brief that the contractual choice of law provision in the Policy compelled the application of California law. At oral argument, however, Legion conceded that the Court need not decide the issue and could apply Delaware law to the coverage dispute for purposes of the pending motion. Underwriters consistently has argued that Delaware law governs this dispute.

LASC Action and thus Underwriters must consider at least the allegations made in "parallel judicial proceedings."

In response, Underwriters argues Legion is not entitled to coverage under Section I.A.1 or Section I.A.2 because (1) the policy is not a duty to defend policy; (2) the "conducted against liability" and "parallel legal proceeding" theories do not apply to give coverage; and (3) the Arbitration Award does not support issue preclusion in a California court both procedurally and substantively. Underwriters contends this Court should issue a declaration that no coverage obligation is owed.

In its reply, Legion clarifies that it is seeking defense reimbursement under both Sections I.A.2 and I.A.3. It argues Section I.A.3 applies because it covers "Wrongful Acts" that include Albert's factual allegations of wrongful conduct by Legion, acting through its officers White and Kipper.

## ANALYSIS

Summary judgment may be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[52] Here, neither side contends there are any material facts in dispute. Both parties agree the coverage issue is ripe for decision on the record before the Court.

---

[52] *E.I. du Pont de Nemours & Co. v. Stonewall Ins. Co.*, 2009 WL 1915212, at *4 (Del. Super. June 30, 2009) (citing Super. Ct. Civ. R. 56(c)).

14

**A. The allegations in the Counterclaim assert a risk within the policy's coverage.**

The policy imposes on Underwriters a duty to advance defense costs. This means Underwriters has a duty to reimburse reasonable defense costs arising out of a covered Claim while the litigation underlying that Claim is ongoing. Although a duty to defend policy is implicated when the "factual allegations in the underlying complaint potentially support a covered claim," a policy that contains a duty to advance is implicated when "an action states a claim covered by the policy."[53] Nevertheless, Delaware recognizes that both duties arise "whenever the underlying complaint alleges facts that fall within the scope of coverage," and Delaware courts construe both duties "broadly in favor of the policyholder."[54] A duty to advance is distinct from the duty to indemnify because the duty to advance defense costs is triggered at the beginning of the case, as opposed to the duty to indemnify, which is triggered at the end of the case.[55] Under a policy that contains a duty to advance, an

---

[53] *Verizon Commc'ns Inc. v. Illinois Nat'l Ins. Co.*, 2017 WL 1149118, at *6 (Del. Super. Mar. 2, 2017), *rev'd on other grounds*, 222 A.3d 566 (Del. 2019) (citing *Cont'l Cas. Co. v. Alexis I. DuPont Sch. Dist.,* 317 A.2d 101, 105 (Del. 1974)) (emphasis added) (internal quotations omitted); *Ferrellgas Partners L.P. v. Zurich Am. Ins. Co.*, 2020 WL 363677, at *9 (Del. Super. Jan. 21, 2020), *appeal denied*, 2020 WL 764155 (Del. Super. Feb. 17, 2020).

[54] *Verizon Commc'ns,* 2017 WL 1149118 at *6 (quoting *Federal Ins. Co. v. Kozlowski*, 792 N.Y.S.2d 397,401-03 (N.Y. App. Div. 2005)) (finding that the same law applies in Delaware and New York regarding the duty to defend and to advance defense expenses); *IDT Corp. v. U.S. Specialty Ins. Co.*, 2019 WL 413692, at *10 (Del. Super. Jan. 31, 2019).

[55] *See id.; In re WorldCom, Inc. Sec. Litig.*, 354 F. Supp. 2d 455, 464 (S.D.N.Y. 2005) (with duty to advance costs, insurer must pay defense costs as soon as attorney's fees are incurred regardless of the final disposition of the case).

insurer has an absolute duty to advance costs for any litigation that falls within the policy terms.[56]

Although the underlying litigation—the Arbitration—has concluded, both sides agree that the issue before the Court is whether Underwriters' duty to advance was triggered, thereby requiring Underwriters to reimburse Legion for the defense costs it incurred relating to the Counterclaim. This Court must determine what claims, if any, could result in indemnity.[57] How the arbitrator ultimately resolved the Counterclaim is not relevant to this analysis.

Legion, as the insured, ultimately "bears the burden of proving that a claim is covered by an insurance policy," and if satisfied, "the burden shifts to the [I]nsurer to prove that the event is excluded under the policy."[58] Where defense costs are concerned, the Court must look to the underlying complaint's allegations in order to determine whether the action states a claim covered by the policy.[59] But, the Court is not limited by how the claims are characterized or formally titled in the pleadings.[60] Instead, a reviewing court considers the facts alleged and the reasonable

---

[56] *See In re WorldCom*, 354 F. Supp. 2d at 464; *see also W. Cas. & Sur. Co. v. Adams Cty*., 534 N.E.2d 1066, 1068 (Ill. App. Ct. 1989) (duty to defend is broader than duty to indemnify because the claims do not necessarily need to result in indemnification in order to trigger the duty to defend).

[57] *Sun-Times Media Grp., Inc. v. Royal & Sunalliance Ins. Co. of Canada*, 2007 WL 1811265, at *11 (Del. Super. June 20, 2007).

[58] *See Virtual Bus. Enterprises, LLC v. Maryland Cas. Co*., 2010 WL 1427409, at *4 (Del. Super. Apr. 9, 2010).

[59] *See Cont'l Cas. Co.,* 317 A.2d at 103.

[60] *Verizon Commc'ns*, 2017 WL 1149118, at *6; *IDT*, 2019 WL 413692, at *10.

inferences to be drawn from them to determine whether the complaint's allegations, when read as a whole, assert a risk within the policy's coverage.[61]

## 1. Underwriters must indemnify Legion under Section I.A.3 of the Policy for its defense against the Counterclaim.

Section I.A.3 requires Underwriters to cover Legion under the following circumstances:

> The Insurer shall pay, on behalf of the **Insured Organization**, **Loss** arising from **Claims** against any **Insured Organization** for a **Wrongful Act** (Privately Owned Managers).[62]

The Court initially must determine whether Legion sustained a "Loss" in accordance with the terms of the Policy. Relying on Sections I.A.1 and I.A.2 of the Policy, Underwriters argues Legion must prove it has actually paid as indemnification Loss arising from a Claim against White and Kiper for a Wrongful Act before Underwriters' reimbursement obligation is triggered. Underwriters explains that White and Kiper could not have sustained a Loss to be indemnified because they were not parties in the Arbitration.

Underwriters' argument is inconsistent with the Policy's unambiguous terms.[63] Section I.A.3 expressly provides coverage to the Insured Organization

---

[61] *See Blue Hen Mech., Inc. v. Atl. States Ins. Co.,* 2011 WL 1598575, at *2 (Del. Super. Apr. 21, 2011) ("The Court may review the complaint as a whole, considering all reasonable inferences that may be drawn from the alleged facts."), *aff'd,* 29 A.3d 245 (Del. 2011); *Verizon Commc'ns,* 2017 WL 1149118, at *7 (citing *Cont'l Cas. Co.*, 317 A.2d at 103).

[62] Plf.'s Mot., Ex. 1 § I.A.3.

[63] The Court should interpret contract language as it "would be understood by any objective, reasonable third party." *Salamone v. Gorman,* 106 A.3d 354, 367–68 (Del. 2014). In reviewing

(Legion) for "Loss arising from Claims against any Insured Organization for a Wrongful Act."[64] "Claim" includes a "counterclaim … made against an Insured." The Counterclaim is "made against" Legion and thus constitutes a "Claim" under the Policy. The issue is whether this Loss arises from a Claim "for a Wrongful Act."

Underwriters cannot avoid the broad definition of "Wrongful Act" contained in the Policy. With respect to this case, "Wrongful Act" means:

> *any* actual or *alleged* breach of duty, neglect, error, misstatement, misleading statement, omission or act committed (or omitted) … by the **Insured Organization** or any **Insured Person** solely in their respective capacities as such, or any matter claimed against them solely by reason of their status as an Insured Person or as a Controlling Person or selling shareholder…."[65]

The Policy defines "Wrongful Acts" in the same manner as the insurance policy in *IDT Corp. v. U.S. Specialty Ins. Co.*[66] There, this Court found that "Wrongful Acts"

---

the terms of an insurance policy, the Court considers the insured's reasonable expectations at the time it executed the policy to determine whether the policy's terms are ambiguous, confusing, or misleading. *See E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.*, 1996 WL 111205, at *2 (Del. Super. Jan. 30, 1996) (citing *Hallowell,* 443 A.2d at 927); *see also Steigler v. Ins. Co. of N. Am.,* 384 A.2d 398, 401 (Del.1978) ("[A]n insurance contract should be read to accord with the reasonable expectations of the purchaser so far as the language will permit.") (quoting *State Farm Mutual Auto. Ins. Co. v. Johnson,* 320 A.2d 345 (Del. 1974)). Absent ambiguity, contract terms should be accorded their plain, ordinary meaning. *Alta Berkeley VIC. V. v. Omneon, Inc.,* 41 A.3d 381, 385 (Del. 2012); *see also Goggin v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 2018 WL 6266195, at *4 (Del. Super. Nov. 30, 2018); *IDT,* 2019 WL 413692, at *7. Ambiguity exists when the disputed term fairly is susceptible to more than one meaning. *Id*. If the language is "clear and unequivocal," the Court will read the terms of the policy in accordance with their plain meaning. *See Admiral Ins. Co.,* 1996 WL 111205, at *2 (quoting *Hallowell v. State Farm Mut. Auto. Ins. Co.,* 443 A.2d 925, 926 (Del. 1982)).

[64] Plf.'s Mot., Ex. 1 § I.A.3.

[65] *Id*. at § II.37.

[66] *IDT*, 2019 WL 413692, at *9.

were not limited only to conduct that constitutes a "breach of duty."[67] This Court in

*IDT* explained:

> Rather, Wrongful Acts encompass a broad array of specifically enumerated conduct. The types of conduct preceding in the list connects to "breach of duty" via a disjunctive "or." And so, each term in the string must be afforded a separate and independent meaning. "Breach of duty" does not absorb, or incorporate, or otherwise make the other exemplified conduct duplicative or meaningless. To the contrary, each term represents a separate, independent act that, if other requirements are satisfied, is capable of triggering coverage obligations under the U.S. Specialty policy. Therefore, in construing the language of the U.S. Specialty Policy, the Court finds that a "Wrongful Act" is not limited to a "breach of duty." Any conduct that is an "act," or an "error," or a "misstatement," or a "misleading statement," or "neglect," or an "omission" could be a "Wrongful Act."[68]

Similarly, this Court broadly construes "Wrongful Act" and examines whether the underlying Counterclaim "alleges facts that fall within the scope of coverage."[69] In the Counterclaim, Albert makes factual allegations that Legion committed Wrongful Acts through its controlling members, White and Kiper. Specifically, Albert alleges his Counterclaim "stems from multiple breaches of fiduciary duty and violations of federal laws and regulations by two self-dealing hedge fund managers who abused their roles as fiduciaries to clients[.]"[70] The Complaint also alleges:

> 34. During the second and third quarters of 2017, [Legion] was engaged in a strategy of acquiring a large equity position in a company called

---

[67] *Id.*
[68] *Id.*
[69] *Id.* (quoting *Verizon Commc'ns*, 2017 WL 1149118, at *6).
[70] Plf.'s Mot., Ex. 8 ¶ 1.

BroadSoft, Inc., traded on the NASDAQ under the symbol BSFT. [Legion's] goal was to acquire at least 5% of the outstanding stock of BroadSoft, which would require, within ten days of achieving that result, a disclosure of its ownership to the SEC on a beneficial ownership report, commonly called a "Schedule 13D."[71]

36. The investment vehicles used by [Legion] for the accumulation of BroadSoft stock were L.P. I, L.P. II, and Spec Ops VI. All three vehicles were limited partnerships set up with Legion Partners Holdings, through its subsidiary Legion Partners Fund GP, as the general partner. White and Kiper were managing members of Legion Partners Holdings and were, therefore, responsible for the conduct of the general partner of these funds.[72]

40. The confidentiality of [Legion's] strategy of acquiring, reforming, and selling BroadSoft was of paramount importance to the investors in L.P. I, L.P. II, and Spec Ops VI.  If the investing public, or any significant subset, were to learn of [Legion's] acquisition strategy, these third-party investors could crowd into the stock, prematurely driving up the stock price.  Such an increase in share price during an acquisition attempt would make acquisition costlier for the funds' investors, possibly to the point of making the completed acquisition infeasible.

41. Nevertheless, by no later than September 8, 2017, on information and belief, while still in the process of accumulating the BroadSoft position, someone within [Legion] leaked the details of [Legion's] acquisition strategy. A reporter published these details in an article in Activistmonitor entitled "BroadSoft under activist scrutiny, source says," a true and correct copy of which is attached hereto as Exhibit A. The article disclosed key details of [Legion's] strategy including: (1) that it intended to acquire at least 5% of BroadSoft and file a Schedule 13D; (2) the value of [Legion's] current stake in BroadSoft; (3) [Legion's] purchase price strategy with respect to BroadSoft stock; (4) [Legion's] activist steps and communications with BroadSoft management; and (5) that [Legion] was working in concert with other activist investors.[73]

---

[71] *Id.* ¶ 34.
[72] *Id.* ¶ 36.
[73] *Id.* ¶ 41.

Read as a whole, the Counterclaim asserts a risk within the policy's coverage.[74]   Looking beyond Albert's characterization of his claims, the Court reasonably can infer from the Counterclaim that Legion, acting through White and Kiper, allegedly acted against its investors' interests and violated federal laws and regulations by leaking material, nonpublic information.[75]   Such acts fall within the scope of "Wrongful Acts" as contemplated by the Policy.[76]

Furthermore, this Court broadly has construed the phrase "for a Wrongful Act" so that a Claim need only arise from Wrongful Acts.  For instance, under the D & O policy at issue in *Ferrellgas* Partners *L.P. v. Zurich American Insurance Co.*, the Underwriter was obligated to pay "all Loss for which the Company becomes legally obligated to pay on account of a Claim first made against the Company … for a Wrongful Act."[77]   The Court interpreted the phrase "for a Wrongful Act" to mean that the "duty to advance defense costs is triggered by a *Claim arising from Wrongful Acts*."[78]   Critically, that phrase was not interpreted to require the Claim to

---

[74] *Verizon Commc'ns*, 2017 WL 1149118, at *7 (citing *Cont'l Cas. Co.*, 317 A.2d at 103, 105).

[75] *See IDT*, 2019 WL 413692, at *10.

[76] It is undisputed that wrongful termination and whistleblower violations are not covered by the Policy.  Contrary to Underwriters' argument that the lack of coverage over these matters is equivalent to an exclusion from the Policy, Section V of the Policy has a detailed list of exclusions. If it was Underwriters' intent to completely exclude from coverage any loss incurred in a lawsuit alleging wrongful termination and whistleblower violations, it would have drafted the Policy accordingly.

[77] *Ferrellgas Partners L.P. v. Zurich Am. Ins. Co.*, 2020 WL 363677, at *5 (Del. Super. Jan. 21, 2020), *appeal denied*, 2020 WL 764155 (Del. Super. Feb. 17, 2020).

[78] *Id*. at *9 (emphasis added).

also request certain relief that would impose legal liability on the Insureds for the Wrongful Act.[79]

In sum, Legion incurred defense costs (a Loss) arising from the Counterclaim (a Claim) that was based on Legion's errors, neglect, acts, or omissions, through White and Kiper, arising from White and Kiper's alleged leaking of confidential information (a Wrongful Act). Accordingly, the Court finds that Legion has incurred a loss that is covered under Section I.A.3 of the Policy.

### 2. Underwriters also must indemnify Legion under Section I.A.2 of the Policy for its defense of factual allegations against White and Kiper.

Coverage for the Counterclaim also independently was triggered under Section I.A.2 of the Policy, which states:

> The Insurer shall pay, on behalf of the **Insured Organization** for **Loss** which the **Insured Organization** pays as indemnification to any **Insured Person** arising from a **Claim** for a **Wrongful Act**.

As stated above, the "Defense Costs" are a "Loss," and Legion incurred the Loss defending the factual allegations Albert lodged against White and Kiper. The

---

[79] In *Ferrellgas*, the Court ultimately held that although the factual claim for fraudulent inducement may have arisen from the "Wrongful Acts," the duty to advance defense costs was not triggered. The Policy defined "Loss" as "the amount the 'Insureds' become legally obligated to pay on account of 'Claims' made against them for 'Wrongful Acts.'" *Id.* at 5 Because the underlying complaint only requested relief for breach of contract, as opposed to relief for fraudulent inducement, there was no legal obligation for the Insureds to pay on account of a "Claim," and, consequently, no "Loss." *Id.* at *10. That analysis does not apply in this case because the Policy defines "Loss" to include "Defense Costs," which are in turn defined to mean "reasonable legal fees, costs and expenses … incurred by the Insured in the … defense ... of a Claim …." Plf's Mot., Ex. 1 §§II.4, II.21. Accordingly, there is no requirement for Legion to have a legal obligation to pay on account of a Claim, and it is sufficient for Legion to incur reasonable legal fees, costs, and expenses in defending a Claim that arises from a Wrongful Act.

Counterclaim is a "Claim," as is the LASC Amended Complaint. The Counterclaim alleged White and Kiper, who are "Insured Persons," breached their fiduciary duties and violated federal laws and regulations regarding the release of confidential information. These allegations and the inferences to be drawn from them constitute "Wrongful Acts" as defined by the policy.[80] As Underwriters also admitted, the LASC Amended Complaint alleged claims against White and Kiper that fell within the Policy coverage. It is undisputed that the factual claims asserted against White and Kipper in the LASC Amended Complaint are in substance the same factual allegations contained in the Counterclaim.

The parties have debated whether the Arbitration Award would have any collateral estoppel effect in the LASC Action, thereby compelling Legion to defend White and Kiper or risk being collaterally estopped from doing so in the LASC Action. But even if the Arbitration Award would have no preclusive effect on White and Kiper's defense in the LASC Action, the factual allegations against those two individuals required Legion to defend their conduct in order to defend the Counterclaim. Accordingly, the Claim was one for a "Wrongful Act" by Insured Persons, even though those persons were not named as defendants in the Arbitration. This meets the definition of Section I.A.2.

---

[80] *See* Plf.'s Mot., Ex. 1 § II.37.

**B. Although Underwriters must advance some of the Defense Costs incurred in the Arbitration, allocating the costs between covered losses and uncovered losses must await further proceedings.**

The Court's determination that the Defense Costs incurred in the Arbitration constitute a "Loss" does not mean that issues regarding allocation also have been determined.[81] This Opinion's scope is limited to whether at least some of the costs incurred in defense of the Counterclaim constitute a "Loss" for purposes of reimbursement. Although the answer to that question is "yes," that conclusion does not mean all the Defense Costs are covered. The Policy contains an allocation provision that provides:

> The Insurer will not make any payments on account of any portion(s) of Claims not covered by this Policy. If the Insured incurs both covered Loss and uncovered Loss in connection with the same Claim, whether due to the presence of covered and uncovered persons or matters, the Insurer and the Insured agree to allocate such amounts between covered Loss and uncovered Loss, including Defense Costs, judgments, and/or settlements, based on the Insurer and the Insured's relative legal and financial exposures.[82]

The Allocation Provision requires Underwriters and Legion to attempt to allocate the covered and uncovered claims using "reasonable best efforts."[83] The parties have not yet undertaken that effort. Only if such efforts fail will the Court be required to determine allocation.[84]

---

[81] *See Arch Ins. Co. v. Murdock*, 2019 WL 2005750, at *10 (Del. Super. May 7, 2019).
[82] Plf.'s Mot., Ex. 1, § VI.
[83] *Id.* § VI.B.
[84] *Arch Ins. Co.*, 2020 WL 1865752, at *8.

Moreover, in duty to advance cases, an insurer is entitled to differentiate between covered and non-covered claims from the outset.[85]  In addition to the Counterclaim, Legion seeks coverage for at least some of the affirmative defenses it asserted in the Arbitration.  "Contract language that is clear and unambiguous should be given its ordinary and usual meaning."[86]  Furthermore, in a litigation context, Delaware recognizes a broad meaning of defense costs.[87]  The cost of prosecuting counterclaims may be covered if conducted in defense of liability.[88]

Here, certain affirmative defenses may be covered if they were conducted in defense of liability for alleged wrongful acts.  The parties, however, have not briefed the specific affirmative defenses Legion asserted or whether they were conducted in defense of liability for the covered Wrongful Acts.  Legion conceded at the Hearing that the Court need not determine at this stage which affirmative defenses, if any, were conducted against liability.

---

[85] *AR Capital, LLC v. Xl Specialty Ins. Co*., 2018 WL 6601184, at *8 (Del. Super. Dec. 12, 2018).
[86] *Delaware Fin. Mgmt. Corp. v. Curtis W. Steen*, 1998 WL 961772, at *4 (Del. Super. Oct. 13, 1998), *aff'd sub nom. Delaware Fin. Mgmt. Corp. v. Steen*, 734 A.2d 640 (Del. 1999).
[87] *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 824 (Del. 1992).  "Defense" is defined as "[t]hat which is offered and alleged by the party proceeded against in an action or suit, as a reason in law or fact why the plaintiff should not recover or establish what he seeks. That which is put forward to diminish plaintiff's cause of action or defeat recovery. Evidence offered by accused to defeat criminal charge."  Black's Law Dictionary 377 (5th Ed.1979). *See also Nat'l Union v. Rhone-Poulenc,* 1994 Del. Super. LEXIS 734 (Super. July 29, 1994) ("It seems clear as a general matter that compulsory counterclaims are part of the "defense" which the insurers have agreed to provide, and that all expenses reasonably necessary to conduct the defense are covered, whether or not they have an ancillary benefit to the insured.").
[88] *Id.*

25

Moreover, Section VI of the Policy appears to contemplate that the parties will attempt to reach an agreement on allocation "based on the Insurer and the Insured's relative legal and financial exposure."[89] It is clear that the parties must allocate the covered costs Legion incurred in defense of the Counterclaim and the uncovered costs Legion incurred pursuing its claims that Albert violated the Employment Agreement and the Confidentiality and Intellectual Property Agreement. Those negotiations also should address and attempt to resolve what affirmative defenses were conducted against liability.

## CONCLUSION

For the foregoing reasons, Legion's motion for partial summary judgment is **GRANTED**. The amounts Underwriters owes Legion can be determined separately between the parties.

---

[89] Plf.'s Mot., Ex. 1 § VI.